**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Joshua William SANDERS, Defendant–Appellant.**

No. 93–10780.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 13, 1994.

Decided Nov. 23, 1994.

**482**

Ann C. McClintock, Asst. Federal Public Defender, Sacramento, CA, for defendant-appellant.

Miguel Rodriguez, Asst. U.S. Atty., Sacramento, CA, for plaintiff-appellee.

Before: GOODWIN, POOLE, and REINHARDT, Circuit Judges.

Opinion by Judge GOODWIN; Partial Dissent by Judge REINHARDT.

GOODWIN, Circuit Judge:

Joshua William Sanders appeals his conviction and sentence on two counts of mailing a threatening communication. 18 U.S.C. § 876. He argues that the district court erred: (1) in concluding that his offense did not constitute a "single instance evidencing little or no deliberation," U.S.S.G. § 2A6.1(b)(2); (2) in failing to notify him that it intended to reject the presentence report's recommendation on § 2A6.1(b)(2); (3) in adding two points to his criminal history score for juvenile offenses; and (4) in inadequately informing him of the consequences of changing his plea. We affirm.

## I.

In April, 1990, Sanders wrote two "letters" consisting almost entirely of racial epithets and derogatory language. He addressed the first of these letters to "N.I.G.G.E.R.S." and mailed it to the Fairfield chapter of the National Association for the Advancement of Colored People ("the NAACP"). On the envelope, Sanders wrote "Watch out this might be a letter b____," "die," "go back to Africa," and other derogatory remarks. In the letter itself, Sanders drew a caricature of an African–American person and wrote a variety of racial slurs.

Sanders addressed the second letter to "Jewish Pussy's" [sic] and mailed it to the B'Nai Avraham Jewish Congregation in Fairfield ("the Jewish Congregation"). He decorated the envelope and letter with various anti-Semitic drawings, threats, and offensive phrases.

Both letters bore the return address, "Fairfield W.A.R." (i.e. White Aryan Resistance), and a Fairfield post office box registered to Sanders. The handwriting matched Sanders'. After FBI agents confronted Sanders with the match, Sanders admitted sending both letters, explaining that he had written and mailed both letters early one morning while drunk.

Sanders was charged with two counts of mailing a threatening communication, a felony, 18 U.S.C. § 876, and one count of interfering with housing rights, a misdemeanor, 42 U.S.C. § 3631(a). The misdemeanor charge alleged that the NAACP office which received Sanders' first communication was also the chapter president's home.

Sanders initially pled guilty to Count I, mailing a threatening communication to the Jewish congregation, and Count III, interfering with housing rights.[1] Based on this plea, the presentence report calculated a sentence range of ten to sixteen months and recommended a sentence of five months in custody, five months in community confinement, and three years of supervised release. However, the report also expressed an opinion that, had Sanders pled guilty to Counts I and II (the two felony mailing a threatening communication charges), rather than to Counts I and III, the applicable guidelines range would have been six to twelve months and Sanders would have been eligible for straight probation.

Sanders therefore moved to withdraw his guilty plea and substitute a new guilty plea to Counts I and II, the two felony counts of mailing a threatening communication. The government opposed this motion. However, the district court allowed Sanders to withdraw his plea, expressing concern about the misdemeanor's factual basis and noting that the government had not presented any evidence that Sanders knew that the NAACP office was a private residence. Sanders then pled guilty to the two felonies.

A revised presentence report calculated a guidelines range of six to twelve months and recommended that Sanders serve two months imprisonment, six months community confinement, and three years supervised release. The revised report also recommended that Sanders receive a four-level reduction in offense level because his offense "involv[ed] a single instance evidencing little or no deliberation." U.S.S.G. § 2A6.1(b)(2). After full briefing and a hearing on the issue, however, the district court denied Sanders the four-

level reduction, resulting in a guidelines range of fifteen to twenty-one months. The court sentenced Sanders to two concurrent fifteen-month prison terms followed by three years of supervised release.

## II. § 2A6.1(b)(2) REDUCTION FOR A SINGLE INSTANCE EVIDENCING LITTLE OR NO DELIBERATION

Sanders first challenges the district court's refusal to award him a four-level reduction under U.S.S.G. § 2A6.1(b)(2). We review the district court's interpretation of the relevant guidelines de novo, accepting its underlying factual findings unless clearly erroneous. *United States v. McAninch*, 994 F.2d 1380, 1383 (9th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 394, 126 L.Ed.2d 342 (1993). *United States v. Fine*, 975 F.2d 596, 599 (9th Cir.1992) (en banc).

### A. Single Instance

The district court found that Sanders' conduct did not constitute a "single instance" within the meaning of § 2A6.1(b)(2) because "enough distinguishes [the letters'] preparation and mailing that they cannot be described as comprising one 'instance.'" Sentencing Memorandum at 5 (Dec. 2, 1993). In particular, the court noted that the letters were

> addressed to two different groups of victims, they were sent to different locations, they were deposited in different mail boxes, the contents of each letter differed significantly, both were specifically tailored to the different racial or religious characteristics of the groups of intended victims, and each letter contained a different threat of violence.

*Id.* at 5–6.

Sanders argues that the district court misinterpreted the Guidelines, construing "single instance" as "single threat" rather than "single episode." He relies primarily on *United States v. Pacione*, 950 F.2d 1348, 1356 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 3054, 120 L.Ed.2d 920 (1992), in which

---

1. In return, the government agreed not to oppose a reduction for acceptance of responsibility or a four-level decrease for a "single instance evidencing little or no deliberation." U.S.S.G. § 2A6.1(b)(2).

the defendant twice threatened an IRS agent over the phone and then went to the IRS office an hour later and (according to a bystander) told his friend that he was going to blow up the IRS office. *Id.* at 1351. Sanders emphasizes that Pacione received the § 2A6.1(b)(2) reduction, despite making multiple threats, and cites the case as an indication that "offense conduct that involves multiple illegal acts may still involve a 'single instance evidencing little or no deliberation' within the meaning of § 2A6.1(b)(2)." Pet. R'hg at 9. According to Sanders, his conduct, like Pacione's, took place over a few short hours and thus constitutes a "single instance" of misconduct, even if it involved several threats.

While *Pacione* is the only published circuit opinion addressing a § 2A6.1(b)(2) reduction,[2] the case is hardly controlling. The Seventh Circuit did not address the validity of the § 2A6.1(b)(2) reduction, merely mentioning the reduction in passing in discussing an unrelated issue. *See Pacione*, 950 F.2d at 1356. Thus, contrary to Sanders' arguments, the Seventh Circuit did not affirm Pacione's § 2A6.1(b)(2) reduction or hold that Pacione's conduct constituted a "single instance evidencing little or no deliberation."

■ Nonetheless, we agree that "single instance" does not necessarily mean "single threat" and that conduct involving several threats may constitute a single instance or episode within the meaning of § 2A6.1(b)(2). As Sanders argues, several related threats, depending on the circumstances, may comprise a single episode of threatening conduct.

■ However, the mere fact that Sanders' conduct took place within a short time span

does not automatically mean that his offense comprises a "single instance." "Single instance" connotes not only a temporal relationship, but also a "single purpose" or "single scheme." Especially when considered together with the "little or no deliberation" requirement, the term suggests that the reduction should apply to defendants whose threats are the product of a single impulse, or are a single thoughtless response to a particular event.

Thus, the "single instance" reduction might not be required where a defendant made several unrelated threats, involving several different victims, even if these threats occurred within a relatively short period of time. The reduction might not apply, for example, where a defendant, within a few hours, but for unrelated reasons, threatened both his ex-wife and a business associate. Likewise, it might not apply where the defendant made a number of similar threats over an extended period of time, as in *Bellrichard*, 801 F.Supp. at 265.

In contrast, the reduction might apply in cases such as *Pacione*, where the defendant threatened a single victim several times within a very short period of time, reacting throughout the misconduct to a single stressful event—in Pacione's case, the IRS's decision to levy his wife's paycheck during her hospitalization for lung cancer. Pacione's threats were all a response to one particular traumatic situation and they were all made over a short period of time.[3]

■ In contrast, Sanders' conduct, while it took place over a period of a few hours, has no such "single motive." He targeted two separate groups, based on two separate sets

---

2. The only other published cases even mentioning § 2A6.1(b)(2) are *United States v. Lowenstein*, 1 F.3d 452, 453–54 (6th Cir.1993) (affirming an upward departure where the defendant wrote a huge volume of threatening letters); *United States v. Jimenez–Otero*, 898 F.2d 813, 814 (1st Cir.1990) (affirming an upward adjustment under § 2A6.1(b)(1) for an "offense involv[ing] any conduct evidencing an intent to carry out such threat" where the defendant brandished a screwdriver while making the threats); *United States v. Bellrichard*, 801 F.Supp. 263, 266 (D.Minn.1992) (denying a § 2A6.1(b)(2) reduction where the defendant wrote a number of letters to several different victims).

3. Sanders assumes that Pacione's misconduct covered at least an hour, because a bystander testified that one hour after the threatening phone call, Pacione was at the IRS office telling his friend that he was going to blow up the IRS office. However, nothing in the opinion indicates that the district court found that this statement was threat, that it was made in the presence of the IRS agent, or that it was anything but a private expression of anger. Thus, Pacione may have been sentenced solely for the two threats made during the phone call.

of prejudices, and two separate sets of motives. Although both letters express racial hatred, writing two letters to two different groups and tailoring each letter to the particular religious or racial characteristics of the group suggests less a "single instance" of aberrant conduct and more a chronic tendency to threaten persons because of their group membership. The district court did not clearly err in finding that Sanders' conduct did not involve a single instance of misconduct or that his two letters constituted two instances, separated not by time, but by victim.

### B. *Little or No Deliberation*

█ Nor did the court err in finding that Sanders' conduct evidenced deliberation. According to the court,

> [t]he contents of the writings themselves demonstrate that some deliberation went into their preparation. Moreover, [Sanders] selected two distinct groups of victims, he selected them for their race and religion, and he tailored the contents of his letters to their race and religion. [He] then obtained the victims' addresses, attached proper postage, and deposited the two letters in two different mail drop boxes. These actions show a deliberate thought process rather than an impulsive action.

Sentencing Memorandum at 7 (citing *Bellrichard,* 801 F.Supp. at 265).

Sanders alleges that the district court inferred deliberation from the ordinary and essential steps involved in mailing a letter. According to Sanders, under the district court's interpretation of deliberation, a defendant convicted of a 18 U.S.C. § 876 violation could never receive a § 2A6.1(b)(2) reduction, as mailing a threatening communication necessarily involves addressing an envelope, affixing postage, and mailing a letter.

We agree that the mere act of mailing a letter does not, in and of itself, necessarily require deliberation. We also agree that the contents of Sanders' letters do not evidence "deliberation" in the sense of intelligent thought—on the contrary, Sanders' offensive racial epithets and caricatures demonstrate an obvious lack of thoughtful consideration.

However, we cannot say as a matter of law that Sanders' letters show "little or no deliberation." Sanders did not just mail a note to a familiar address stating "I am going to kill you." He looked up addresses of particular organizations and selected particular victims. His letters, while relatively short, contain a variety of racist and anti-Semitic statements and drawings, tailored to each of his particular victims. These statements are calculated to frighten and upset two particular groups of victims and to imply that they should take his threats seriously. Sanders' use of group insults and references to white supremacy groups suggests an intent to frighten numerous persons. Although writing such letters certainly does not require intelligent thought, it requires some time and attention.

The district court did not clearly err in finding that Sanders' conduct showed deliberation. While "thought" may not be the most accurate characterization of Sanders' mental effort, the circumstances of the letters showed some planning and a clear intent to harass the target groups.

### III. NOTICE OF INTENTION TO REJECT THE PRESENTENCE REPORT

█ Sanders also contends that the court failed to notify him that it intended to depart from the presentence report's recommendation concerning § 2A6.1(b)(2). As he notes, U.S.S.G. § 6A1.3(a), p.s. requires sentencing courts to give parties "an adequate opportunity to present information" regarding "any factor important to the sentencing determination [which] is reasonably in dispute." Moreover, § 6A1.3(b), p.s. requires courts to "resolve disputed sentencing factors in accordance with Rule 32(a)(1), Fed.R.Crim.Pro ..., notify the parties of its tentative findings and provide a reasonable opportunity for submission of oral and written objections before imposition of sentence." *See also United States v. Brady,* 928 F.2d 844, 847 (9th Cir.1991) (defendant must have notice that the court intends to depart from the presentence report's recommendation); *United States v. Nuno–Para,* 877 F.2d 1409, 1415 (9th Cir.1989).

Sanders contends that he did not learn of the district court's intention to reject the presentence report recommendation until "the close of sentencing." Appellant's Br. at 13. However, the district court first questioned the applicability of § 2A6.1(b)(2) at Sanders' change of plea hearing, more than a month before sentencing. Tr. Nov. 10, 1993 at 8. At this hearing, the government specifically indicated that it would oppose a reduction based on § 2A6.1(b)(2) and argued both that Sanders' conduct constituted "two separate instances" and that "there was a great deal of thought taken to make these threats." *Id.* at 12. Before sentencing, both parties filed briefs on the relevance of § 2A6.1(b)(2) and argued the issue to the court.

Thus, even if the district court failed to issue "tentative findings" before sentencing, Sanders had ample notice and an opportunity to litigate the § 2A1.6(b)(2) issue. *Cf. United States v. Palmer,* 946 F.2d 97, 100 (9th Cir.1991). Any error was harmless.

## IV. CRIMINAL HISTORY POINTS FOR JUVENILE OFFENSES

Sanders next challenges his criminal history score, contending that the district court erred in adding two points for juvenile offenses. The district court accepted the presentence report's recommendation that Sanders receive one point for a 1987 California juvenile court decision declaring him a ward of the court, and one point for a 1988 decision "continuing" his wardship.[4] We review de novo a district court's determination that a prior adjudication falls within the scope of the Sentencing Guidelines. *United States v. Robinson,* 967 F.2d 287, 292 (9th Cir.1992).

■ Sanders does not dispute the fact of his juvenile adjudications, but contends that they are not convictions within the meaning of the Guidelines. As he notes, under U.S.S.G. § 4A1.2(a)(1), a prior sentence "counts" for criminal history purposes only if it was "imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendere.*" *See also United States v. Booten,* 914 F.2d 1352, 1354 (9th Cir.1990) (de-

fendant must have been adjudged guilty). The government bears the burden of proving the fact of a prior conviction. *United States v. Newman,* 912 F.2d 1119, 1122 (9th Cir. 1990).

■ As Sanders argues, a California juvenile adjudication is not a "conviction." *See In re Asean D.,* 14 Cal.App.4th 467, 17 Cal. Rptr.2d 572, 577 n. 11 (1993). However, a child may be declared a ward of the court as a "law violator" only after the government shows "beyond a reasonable doubt" that the child has violated a criminal law. Cal.Welf. & Inst.Code § 701. Thus, Sanders' first juvenile adjudication, in which the court declared him a ward of the court, involved an adjudication of guilt and may be used in calculating his criminal history. *Booten,* 914 F.2d at 1355.

■ However, a California juvenile court may modify a wardship order without a subsequent adjudication of guilt. *In re Glen J.,* 97 Cal.App.3d 981, 159 Cal.Rptr. 148, 151 (1979). Thus, Sanders' second juvenile adjudication, in which the California court "continued" Sanders' wardship, did not necessarily involve an adjudication of guilt. Absent proof that the California juvenile court found Sanders guilty beyond a reasonable doubt, the adjudication may not be used to increase Sanders' criminal history score.

■ We must remand for resentencing unless "the record as a whole, [reveals] that the error was harmless, i.e. that the error did not affect the district court's selection of the sentence imposed." *Williams v. United States,* 503 U.S. 193, ——, 112 S.Ct. 1112, 1121, 117 L.Ed.2d 341 (1992) (interpreting 18 U.S.C. § 3742(f)(1)); *see also United States v. Rodriguez–Razo,* 962 F.2d 1418, 1423–25 (9th Cir.1992) (noting that this standard imposes an "exacting burden" on the party defending the sentence).

Subtracting one point from Sanders' criminal history score will not change Sanders' criminal history category or the applicable guidelines range: Sanders' previous score

---

**4.** According to the presentence report, the first incident involved "petty theft [and] possession of a knife," and the latter involved a "DUI, Violation of Probation." PSI I at ¶ 28, ¶ 29.

was five[5] and Category III includes scores four though six. U.S.S.G. Ch. 5, Pt. A. Thus, with or without the contested point, Sanders' sentencing range is fifteen to twenty-one months. The district court sentenced Sanders to fifteen months, the minimum under the Guidelines. Nothing in the record suggests that the court would have (or could have) imposed a lighter sentence absent the error. Thus, the error was harmless and a remand is unnecessary. *Cf. United States v. Rutledge,* 28 F.3d 998, 1003 (9th Cir.1994).

## V. GUILTY PLEA

■ Finally, Sanders contends that the district court failed to warn him of the consequences of pleading guilty to the two felonies. Fed.R.Crim.P. 11(c)(1). He does not challenge the factual basis of his convictions, and specifically concedes that both letters contained a "threat" within the meaning of 18 U.S.C. § 876. Rather, he emphasizes that the presentence report led him to believe that changing his plea would reduce his sentence.[6]

However, before accepting Sanders' change of plea, the district court specifically advised Sanders that "there are no assurances as to what the Guidelines will be on the two felonies." Tr. Nov. 10, 1993 at 17–18. The court also warned that it "might even find for some reason that because there are two felonies, the Guidelines are higher than they would have been for the misdemeanor and the felony." *Id.*

Sanders did not challenge the validity of his plea in the district court and has thus waived any objections except those which fall within one of the narrow exceptions to the waiver rule or constitute plain error. *United States v. Flores–Payon,* 942 F.2d 556, 558–60 (9th Cir.1991). Sanders has shown neither. Because the presentence report is not prepared until after the defendant pleads guilty, a court cannot "inform [a] defendant of the minimum sentence available under the guidelines" before accepting his plea. *United*

*States v. Maree,* 934 F.2d 196, 200 (9th Cir. 1991). While Sanders' disappointment is understandable, he has not shown plain error.

AFFIRMED.

REINHARDT, Circuit Judge, dissenting in part:

Unlike the defendant in *Pacione,* Joshua Sanders fails to present a particularly sympathetic figure. His threats were not the product of traumatic family illness, and his victim was not an insensitive IRS agent. Rather, Sanders was drunk and motivated by racial animosity. Although Sanders' conduct may evoke considerably less compassion and pity than that of the *Pacione* defendant, he is equally deserving of a lawful sentence for his crime and a fair application of the sentencing guidelines to his criminal conduct.

I disagree with the majority's and the district court's conclusion that Sanders was not entitled to a four-level reduction in offense level at sentencing. In my opinion, the determination that Sanders' illegal acts did not constitute a "single instance evidencing little or no deliberation" is based on a misinterpretation of § 2A6.1(b)(2) of the Sentencing Guidelines.

I would point out preliminarily that our disagreement over the proper interpretation of the Sentencing Guidelines in this case exemplifies the complexity inherent in applying the Guidelines, and the predicament that this complexity poses for defendants. The government's presentence report originally suggested that if Sanders pled guilty to two felonies, rather than a felony and a misdemeanor, he would have a lower offense level and thus a lower sentence. In light of the report, and on the advice of counsel, Sanders withdrew his guilty plea to the misdemeanor and pled guilty to the second felony, believing that by doing so he could reduce his time of imprisonment from five months to proba-

---

5. Sanders received three points for adult offenses, including a 1989 conviction for driving with a suspended license (one point) and a 1990 conviction of assault with a deadly weapon not a firearm (two points).

6. Under Sanders' original plea agreement, the government promised not to contest the applicability of § 2A6.1(b)(2). Sanders lost the benefit of this agreement when he changed his plea.

tion only.[1] He ended up being sentenced to 15 months instead. This occurred only because at the original sentencing hearing, no one—not the judge, nor either counsel—could predict with any accuracy what would be the ultimate consequence of Sanders' change in plea. The Guidelines are too complicated for that. As the district court explained to Sanders, both with candor and with some degree of prescience, "I wouldn't expect you to understand [the Guidelines] because judges and lawyers argue about them all the time." [2]

Although the Guidelines were enacted in reaction to the supposedly arbitrary and unpredictable results of the prior unregulated sentencing regime, the treatment of the defendant here shows that application of the Guidelines can easily produce results that are at least as arbitrary and unpredictable. Certainly, few would suggest that the manner in which the proceedings were handled here was fair or equitable. Nor in all candor, I must add, is such a state of affairs unusual in the Guidelines era.

The majority finds that the phrase "a single instance evidencing little or no deliberation," as used in § 2A6.1(b)(2), is not broad enough to cover a drunken individual's writing of two short and remarkably similar hate letters during a brief time period. I disagree.

## A Single Instance

In declining to extend Sanders the "single instance" reduction, the district court apparently interpreted the word "instance," as meaning "threat," rather than "episode." Although the majority concedes that "single instance" may be broad enough to include a single episode of conduct encompassing more than one discrete threat, it concludes that the term must be evaluated with reference to the motivation of the threats as well as the time span in which they occurred. It then engages in a bit of artful appellate fact-finding and determines that two separate motivations underlay Sanders' actions. By doing so, the majority slices the cheese far too thin as far as I am concerned. Sanders' two letters are clearly linked by motivation as well as time, and, in my view, constitute a single incident.

After returning home at night drunk, Sanders wrote the two hate letters at the same time, mailed them on the same trip to town, and was asleep by 3 or 4 a.m. All of the relevant conduct occurred within a very brief period. Moreover, the letters were the product of a single impulse to vent feelings of bigotry. Both letters contained swastikas and slurs, and the envelopes contained equally simplistic derogatory phrases. The puerile and stick-like drawings inside could each have been drawn by the same third grader.

1. As the Assistant United States Attorney emphasized at oral argument, Sanders' trial counsel knew that, given the parties' disagreement over the application of § 2A6.1(b)(2), there was no guarantee that Sanders' change of plea would result in a lower sentence. Counsel's advice to Sanders to hazard the change of plea may have been mistaken (as it clearly was in retrospect). A review of some of Sanders' other trial papers indicates that, aside from this issue, Sanders may not have benefited from the most effective legal assistance. Nonetheless, in this situation, with these variable factors, even the best of lawyers could not have given Sanders more than an educated guess regarding his sentence under the Guidelines.

2. The twists in Sanders' sentencing saga were further complicated by our original unpublished disposition in this case remanding for resentencing. In a footnote, the majority erroneously stated that under a revised criminal history calculation, the applicable guidelines range was 10 to 16 months. On remand, the magistrate said the guidelines were very complicated and presumed that surely the appellate court had it right. Thus, he released Sanders because Sanders was originally sentenced to the minimum end of the then-applicable range, and under the new appellate formulation, Sanders had already served the minimum ten months.

Subsequently, the government filed a motion to correct this "typographical" error in the disposition. Because we granted the government's separate motion to publish the disposition, the former motion was not addressed. In the present published disposition, this "erroneous" footnote has been eliminated. Presumably the majority now feels confident that 15 months is the applicable minimum for the sentencing range under a correct reading of the sentencing guidelines. Correct or not, the way that the courts have dealt with the sentencing issue in this case does not promote confidence in either the sentencing regime or the justice system.

Sanders' choice of a Fairfield synagogue and the Fairfield NAACP was closely related: they were both representatives of a threat to "Aryan supremacy." Although Jews and African–Americans are two distinct social groups, it is highly artificial, as well as suppositious, to suggest that Sanders' derogation of these two groups was "based on two separate sets of prejudices, and two separate sets of motives." Maj. op. at 14353. Sanders was hardly sophisticated enough to have two separate sets of thoughts. However, if we wish to ignore the content of his pitiful writings and pretend that he was indeed a sophisticated being, then we must recognize that both of the involved groups share the common link of being non-Aryan, and that Sanders' letters were motivated by a singular desire to express his animosity towards "inferior" or non-Aryan peoples.

The majority attempts to minimize the commonality of Sanders' letters by emphasizing that the letters show a "tailoring .... to the particular religious or racial characteristics of the group." The term "tailoring" connotes a kind of careful crafting, an attention to detail and fit. Again, the majority writes as if we were dealing with a thinking person and a rational pair of letters. That is far from the case.[3] The abstract and careful analysis that the majority purports to apply to the two idiotic messages, and the rationality and intellectual conduct that it imputes to the defendant, have nothing to do with what actually occurred. The facts are plain and simple. A drunken boor sat down and unthinkingly wrote two hate letters that delivered the same ugly message. He engaged in no subtle analysis and performed no "tailoring." To him, African–Americans and Jews were the same. To say that these unfortunate messages were tailored to the racial or religious characteristics of the recipients not only ignores the nature of the defendant's ramblings, but requires us to engage in an abstract parsing of the ambiguous and cumbersome sentences of the Guidelines. All that is accomplished by these futile and contrived intellectual exercises is to sustain a result, and a sentence, that is just plain wrong.

### Significant Deliberation

The district court examined the defendant's conduct in sending the letters, and dissected that conduct into all of its constituent steps. Having done so, and having found several steps with respect to each letter, the court found "significant deliberation" as to each. However, under this scrutiny, the mailing of *any* letter would be the product of significant deliberation. Any letter requires writing something, selecting the addressee, finding the addressee's address, attaching a stamp, and putting it in a mailbox. Because 18 U.S.C. § 876 prohibits the mailing of a threatening communication, the steps enumerated by the district court are merely the essential and ordinary ones for a violation of the statute.

Recognizing that the district court's argument proves too much, the majority attempts to bolster the deliberation finding by dissecting the constituent steps of delivering any threat, and declares that these steps demonstrate "time and attention." For every threatening communication, the defendant must "select" a victim and make some statement designed to upset and elicit fear from the recipients. It seems clear, therefore, that at a minimum deliberation for purposes of § 2A6.1(b)(2) requires some showing beyond the deliberation inherent in any intentional threat, and that the majority's rationalizations do not cure the district court's error.

Moreover, there is no reasonable basis for concluding that any element of Sanders' behavior satisfied even the erroneous definition of "deliberation" established by the majority. Sanders was drunk and angry, and hardly in a deliberative state. The letters were handwritten, extremely short, full of misspellings,[4] and contained epithets typical of outbursts of

---

**3.** A reproduction of the letters can be found in the attached appendix.

**4.** The misspellings might seem irrelevant, but even the act of looking words up in the dictionary would evidence a higher degree of deliberation than shown here.

bigotry. They were clearly the product of no deliberation at all.[5]

To stretch the law as the district court did in this case, and as the majority now does also, makes no practical sense. We send a young person to prison for 15 months for getting drunk and, in his drunken stupor, mailing two irrational hate letters. The defendant's state of mind at the time he committed the offense may best be demonstrated by the fact that he affixed his return address to both missives. Surely, there are more sensible ways for society to deal with this young defendant's conduct; surely, there are better ways to try to rehabilitate him and try to make of him a useful citizen; surely, we should at least first try to teach him that, if not soon cured, his bigotry will be the cause of his own destruction rather than the destruction of the groups he stupidly despises;

and surely there must be better uses for our prisons, which are already more than filled to capacity and are on the verge of exacerbating our local, state, and federal governments' economic distress to the breaking point.

In part the error in this case lies in the district judge's construction of the Guidelines—in part it lies in the refusal of my colleagues to treat his error in the manner required by law. The most fundamental problem of all, however, lies with the Sentencing Guidelines, and their attempt to set rigid standards that in the end produce far more confusion and unfairness than existed prior to their adoption. Only Congress can correct that fundamental problem, and regrettably there is little reason to believe it will.

I therefore dissent in part and concur in part.

---

**5.** In contrast, the defendant's conduct in *Pacione*, in which the four-level reduction was granted, evidences significantly more deliberation. There, during working hours, the defendant called the IRS agent, threatened her, gathered together a friend to help him out, drove to the IRS office, and conveyed a new threat. *Pacione*, 950 F.2d at 1351.