# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-4351

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

DAVID FRAZER,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 03-30051-001—**Jeanne E. Scott**, *Judge.*

———————

ARGUED SEPTEMBER 20, 2004—DECIDED DECEMBER 7, 2004

———————

Before POSNER, KANNE, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.*  This case concerns an upward adjustment under the federal sentencing guidelines that is unaffected by the uncertainty created in the wake of *Blakely v. Washington*, ___ U.S. ___, 124 S. Ct. 2531 (2004), and *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004), *cert. granted*, 125 S. Ct. 11 (Aug. 2, 2004).

David Frazer pled guilty to a single-count indictment charging him with using a telephone to make threatening communications in violation of 18 U.S.C. § 844(e). The indictment charged that Frazer made two bomb threats, but

at sentencing the district judge determined that the undisputed evidence demonstrated that he made three separate threats, so he applied U.S.S.G. §2A6.1(b)(2), which provides for a 2-level upward adjustment if the offense involved "more than two threats." Frazer challenges this increase on a legal, not a factual basis, so, undeterred by *Blakely/ Booker*, we proceed to resolve his appeal.

Frazer, in March of 2003, was 34 years old and living with his second wife, Teresa Day, in Mt. Pleasant, Iowa. Ms. Day was divorced from her first husband and, for a time, had custody of her two daughters from that marriage. She lost a custody battle over the children, however, and they went to live a few hundred miles away with Day's ex-husband in Pana, Illinois. Frazer, apparently with some help from Day, tried several schemes to get the children back.

At one time, Day and Frazer discussed kidnapping the children. Frazer even went so far as to cause an obituary announcing his own death to be placed in a local newspaper to assist Day in reclaiming the children on the fraudulent basis that he was no longer around. Frazer also urged the children to run away accuse their father of abuse, and tell school authorities that they were unhappy in Pana and longed to return to their mother in Iowa. On top of all this, Frazer, claiming to be an Illinois social worker, wrote a letter to a state court judge expressing concerns about Day's ex-husband being a bad influence on the children.

Against this backdrop, Frazer hatched a harebrained plot that somehow or other was, in his mind, going to help Day get her children back. He prepared a tape-recorded message announcing that bombs were planted in two Pana schools and on a school bus in the district where the children were enrolled as students. On March 10, 2003, at around 9 a.m., Frazer called the office of the district's superintendent from his home in Iowa. When a secretary answered the phone, he played the recording. The message gave staff about 15

minutes to evacuate the buildings. Frazer then called the Pana Junior High School, where one of the children attended. The secretary who answered the telephone heard only part of the recorded message, but what she heard was enough to alert her to the nature of the call: "If you don't want any of the students to get hurt, you need to evacuate the buildings. The bombs are set to go off at 9:15." Frazer does not dispute the secretary's assertion that he hung up when she tried to transfer the call to the school's principal. He also acknowledges that he called back immediately, reached the same secretary, and replayed the entire recorded bomb-planted message.

Fourteen hundred students and staff were evacuated from four schools in the district in response to Frazer's calls. Police later identified Frazer as the culprit by tracing the calling card number used in making the calls. When officers confronted him, he admitted making the recording but denied making the calls. Frazer was subsequently charged in a single-count indictment with making "two separate bomb threats" to the Pana Community School District. The indictment does not identify which of the three calls gave rise to the charge or explain why only two threats were alleged. We cannot tell if the government's theory of the case was ever clarified because there is no written plea agreement, and no transcript of the plea colloquy has been prepared.

The probation officer recommended in the presentence report that Frazer be given a 4-level upward adjustment under U.S.S.G. §2A6.1(b)(4) because he caused a "substantial disruption of public functions and services" and an increase of 2 levels under §2A6.1(b)(2) because the offense involved "more than two threats." The probation officer justified the latter adjustment on the alternative bases that there were "three phone calls and threats of three bombs." Frazer filed an objection to the 2-level adjustment, asserting that his third call was a de minimis "addition" to the

second because disruption was already underway. He also argued that under §2A6.1(b)(2) several threats might merge and be counted as one if made as part of a "single instance or episode."

At sentencing, Frazer pressed both themes: the second and third calls (and possibly even the first) should be viewed as composing "a single thoughtless action" involving "one single threat," and, alternatively, that the second and third calls constituted a "single attempt to make a threatening communication." Either way, according to Frazer, there were at most two threats. The government responded that all three of Frazer's telephone calls were understood by the listeners as threatening and thus should be counted separately.

Neither party addressed the probation officer's assumption that §2A6.1(b)(2) applied even if Frazer had telephoned just once, given that his recording warned that bombs were planted in three different locations. The district court, how-ever, was persuaded. The court reasoned that equating the number of threats with the number of "locations threatened" better linked the offensive conduct to its actual consequences. The court also noted that the dictionary definition of "threat" is "an expression of intention to inflict evil, injury, or dam-age" and concluded that counting telephone calls was an inadequate way of measuring Frazer's intentions. The court rejected the parties' shared contention that §2A6.1(b)(2) focuses on the number of "threatening communications"; the court observed that this expression is used in the Commen-tary to §2A6.1(b)(2) but not in the text and decided that the use of different expressions must imply a different meaning. Our review of this question of guideline interpretation is *de novo. See United States v. Alvarenga-Silva*, 324 F.3d 884, 886 (7th Cir. 2003); *United States v. Stokes*, 347 F.3d 103, 105 (4th Cir. 2003).

Frazer argues that the district court should have counted the number of "threatening acts" (or "threatening commun-

ications" or "phone calls") rather than the "number of victims" threatened. His argument centers on Application Note 3(B) to §2A6.1(b)(2), which allows for an upward departure "[i]f the offense involved substantially more than two threatening communications to the same victim or a prolonged period of making harassing communications to the same victim, or if the offense involved multiple victims[.]" Frazer contrasts the upward adjustment under §2A6.1(b)(2), which provides for a 2-level increase if the offense involved "more than two threats" but does not contain any reference to "victims," with Application Note 3(B), which does. Because Application Note 3(B) takes the victim or victims into account, he concludes that the Sentencing Commission did not envision §2A6.1(b)(2) as doing so.

We agree with this analysis, although we think the inferences Frazer draws from it are flawed. For one thing, he sets up an artificial dichotomy. The fact that the number of threats is *not* determined by the number of *victims* does not by itself compel us to find that the number *is* determined by the number of *communications*, and Frazer gives us no other reason to read "threats" and "threatening communications" as equivalent. He also mischaracterizes the district court's position by ignoring the logical distinction between the terms the district court chose to embody its definition of threat—"locations"and "areas"—and the expression "number of victims," which the court never used. It is true that if the court focused on locations partly out of concern that more places means more potential victims, then its interpretation of §2A6.1(b)(2) might intrude into Application Note 3(B)'s reliance on upward departure to address offenses involving multiple victims. But this is hardly a necessary reading. In any case, we know that the district court was not counting *individual* "victims" because it found only three threats when more than 1400 students, faculty, and staff in the school district were affected.

Still, we think Frazer's basic proposition that "threats" means "threatening communications" is correct. We are not persuaded by the district court's view that Application Note 3(B) would be redundant if it used "threatening communications" to mean the same thing that the word "threats" does in the text of §2A6.1(b)(2). The only overlap between the guideline and the note is where there are multiple threats targeting the same victim, and in that circumstance the rules have complementary functions. Section §2A6.1(b)(2) alone governs if the number of threats is more than two but not "substantially more." When the number is "substantially more than two," Application Note 3(B) enables the court to impose a further penalty by upward departure.

But more importantly, existing authority associates the number of threats for purposes of §2A6.1(b)(2) with the number of communications made. In *United States v. Spring*, 305 F.3d 276, 280 (4th Cir. 2002), the Fourth Circuit held that the word "threat" has the same meaning in subsection (b)(2) that it has in the underlying federal statutes that criminalize threats, *e.g.*, 18 U.S.C. § 844(e), 18 U.S.C. § 875(c), and 18 U.S.C. § 876(c). Under these statutes, the unit of prosecution is the telephone call or letter; each call or letter is indictable separately as a different "threat." *See United States v. Corum*, 362 F.3d 489 (8th Cir. 2004) (three counts for three telephoned bomb threats under § 844(e)); *United States v. Nedd*, 262 F.3d 85, 88 (1st Cir. 2001) ("four counts of interstate threats" based on four violent telephone messages under § 875(c)); *United States v. Thomas*, 155 F.3d 833 (7th Cir. 1998) (counting five letters as "five death threats" under § 876). We ourselves have assumed that "threats" and "threatening communications" have the same meaning. *See United States v. Bohanon*, 290 F.3d 869, 876 (7th Cir. 2002). *See also United States v. Goynes*, 175 F.3d 350, 355 (5th Cir. 1999) (equating "multiple threatening letters" with "multiple threats" in applying §2A6.1(b)(2)); *United States v. Newell*, 309 F.3d 396, 403 (6th Cir. 2002) (assuming that

"the Sentencing Commission accounted for the number of communications by imposing an enhancement under U.S.S.G. § 2A6.1(b)(2)"). And one of our sister circuits has explicitly defined "threats" as "threatening communications" for purposes of §2A6.1(b)(2). *See United States v. Stokes*, 347 F.3d 103, 106 (4th Cir. 2003) (holding that "the phrase 'more than two threats,' as used in § 2A6.1(b)(2), refers to the number of threatening communications").

The district court's proposal to distinguish separate threats on the basis of location is not wholly incompatible with this authority. The *Stokes* court in particular left open the possibility of counting multiple threats from a single call or letter if the threats "are so distinct in nature and purpose that they should not be treated as a single threat for purposes of § 2A6.1(b)(2)." *See Stokes*, 347 F.3d at 106 n.2. But we are reluctant to endorse this perspective. On the facts before us, we see no reason to expand or complicate what appears to be the accepted understanding that §2A6.1(b)(2) measures the number of threatening communications. Threats to multiple locations implicate more victims and create greater disruption, but the guidelines already provide for both of these concerns. Application Note 3(B), of course, provides for departure where there are multiple victims, and §2A6.1(b)(4)—which the district court also applied and which Frazer does not challenge—provides for an increase of 4 levels if there is a "substantial disruption of public, governmental, or business functions or services." Moreover, the district court's view does not find an advocate even in the government. The government defends the application of the "more than two threats" adjustment on the basis that Frazer made three telephone calls and responds to the district court's position only by insisting that we need not decide its validity.

For now, though, we do not decide whether in an appropriate case the number of threats might turn on more than the number of communications. It is undisputed that there

were three telephone calls, each containing a recorded message threatening that a bomb was planted. To prevail even under his interpretation of §2A6.1(b)(2), Frazer must show that at least one of the calls was not a "communication," or for some other reason does not qualify as a threat, and he is unable to do so.

Frazer argues that cases interpreting an "earlier version of U.S.S.G. §2A6.1(b)(2)" support the idea that several threats may be combined in a "single instance or episode." He relies heavily on *United States v. Sanders*, 41 F.3d 480, 484 (9th Cir. 1994), which concluded that a downward adjustment under the former §2A6.1(b)(2) applies when threats may be regarded as "the product of a single impulse" or "a single thoughtless response to a particular event." However, the only connection between the former and the current versions of §2A6.1(b)(2) is the section number. The 1997 amendment giving rise to the current §2A6.1(b)(2) substantially revised the guideline, and the new version is entirely different from that of the provision interpreted in *Sanders*, 41 F.3d at 484. It is clear that the "more than two threats" language does not represent an attempt to replace or clarify the old provision, because the old provision remains. It has simply been moved elsewhere—it is now located at §2A6.1(b)(5). Even if Frazer is correct that the second and third calls would qualify as a single instance under *Sanders*, that tells us nothing about how they would be treated in the context of the new §2A6.1(b)(2).

Ultimately, the question comes down to whether the second or third calls can properly be said to be de minimis. Frazer adduces no legal authority for this proposition, and we have been unable to find a single case in which a federal court found *any* threat of violence to be de minimis. Furthermore, there is no question that all three calls were "true threats" under the test of *United States v. Khorrami*, 895 F.2d 1186 (7th Cir. 1990). The calls conveyed a message that a reasonable person would foresee a recipient interpret-

ing as an expression of intent to cause serious harm. *Id.* at 1192. By insisting that the third call was a continuation of the second, Frazer is really arguing that what matters is the number of communications he intended to make. But the test we apply is an objective one. *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990). By that measure there were three threats.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*