[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-12511

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 10, 2006
THOMAS K. KAHN
CLERK

D.C. Docket No. 04-00226-CR-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JESSIE SCOTT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(March 10, 2006)

Before CARNES, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

Jessie Scott appeals his sentence of 120 months imprisonment for threatening a federal official in violation of 18 U.S.C. § 115(a)(1)(B). He contends that we should vacate his sentence because the district court erred in three ways: (1) by applying a two-level enhancement pursuant to United States Sentencing Guidelines § 2A6.1(b)(2) on the ground that he committed an offense that "involved more than two threats;" (2) by applying a six-level enhancement pursuant to U.S.S.G. § 2A6.1(b)(1) on the ground that Scott had engaged in "conduct evidencing an intent to carry out such threat;" and (3) by increasing his sentence beyond the guidelines range based on the 18 U.S.C. § 3553(a) factors without giving Scott notice like that required by Fed. R. Crim. P. 32(h) for departures.

## I.

In October 2001 at the age of eighteen Scott was convicted of carjacking in the Southern District of Alabama. He was sentenced by United States District Court Judge Charles R. Butler to sixty months imprisonment. Scott was unhappy with the sentence he received and mad at the judge who imposed it.

On September 13, 2004, while serving his sentence at the Coleman Federal Correctional Complex in Florida, Scott mailed an envelope to Judge Butler at the United States District Courthouse for the Southern District of Alabama. The

envelope was marked with a return address which included Scott's name and inmate identification number. Inside, there was a letter that stated: "I get out in 2007, So U need to watch Your back Every Step Of The Way . . . I Will Get you Killed One Day." It was signed, "TIME BOMb."

On September 19, 2004, Scott mailed a second envelope to Judge Butler at the federal district courthouse with the same return address. That envelope contained a letter which made reference to blowing up the "fed building," and killing "all feds, judges" among other things. Also inside that envelope was another envelope containing yet another letter that stated: "I shall kidnap your kids and blow up your luxury car up [sic] . . . Heres [sic] a surprise HAPPY HALOWEEN [sic]." The "surprise" was that this inner envelope also contained a white powder. The powder was later identified as a cleaning substance. Judge Butler's staff promptly notified the United States Marshals Service of the written threats.

Agents from the Federal Bureau of Investigation interviewed Scott in prison on September 23, 2004. He told the agents that he had mailed the threatening letters because he believed that the judge had lied to him regarding the sentence he would receive if he cooperated with the government; Scott believed that he had been promised a thirty-month sentence rather than one of sixty months. Scott said

that he placed the white cleaning substance in the envelope to "scare [the judge] good." When asked if he really intended to kill the judge when released from prison, Scott told the agents: "There are a lot of people that I want to do something to, but I have not made up my mind when or where I will do it." Upon hearing this response, one of the agents remarked that it sounded as if Scott truly intended to harm the judge and asked him to clarify his statement. Scott just smiled and said that he had nothing more to say.

On November 17, 2004, a grand jury sitting in the Southern District of Alabama handed down a six-count indictment against Scott. Two months later, he pleaded guilty to the first count, threatening a federal official in violation of 18 U.S.C. § 115(a)(1)(B), and filed a "factual resume," in which he admitted the elements of the offense. There was no written plea agreement.

The Pre-Sentence Investigation report (PSI) set Scott's base offense level at 12 in keeping with U.S.S.G. § 2A6.1(a)(1) (2004). It recommended a six-level § 2A6.1(b)(1) enhancement on the ground that the offense involved "conduct evidencing an intent to carry out such threat." A two-level § 2A6.1(b)(2) enhancement was recommended because "the offense involved more than two threats." Next, the offense level was adjusted upward six levels pursuant to § 3A1.2(b) because all three prerequisites for application of that guideline

4

provision were met:  the victim was a government officer, the offense was motivated by that status, and the base offense level was set under Chapter Two, Part A of the Guidelines (Offenses Against the Person).  Finally, Scott was granted a three-level reduction for acceptance of responsibility pursuant to § 3E1.1(a) and (b).  The enhancements and reduction netted out to a total offense level of 23. Scott was found to be in criminal history category IV, which at offense level 23, provided an advisory guideline range of 70 to 87 months imprisonment.  The statutory maximum sentence for Scott's offense was 120 months. 18 U.S.C. § 115(a)(1)(B)(b)(4).

Scott filed two objections to the PSI that are relevant here.  First, he objected that because the only conduct he had engaged in was mailing the envelopes, the six-level enhancement for conduct evidencing an intent to carry out the threats was not warranted.  At the sentencing hearing, Scott contested the government's theory that the statement he had made to the FBI agents after the threatening letters had been mailed amounted to conduct evidencing an intent to carry out the threats.  Because there was no evidence of any preparation to carry out the threats, only evidence of the threats themselves, Scott argued that § 2A6.1(b)(1) was inapplicable.

The second objection Scott made to the PSI was that, "[w]hile there were three envelopes, there were only two mailings," and therefore only two threats for purposes of § 2A6.1(b)(2), making the two-level enhancement for "more than two threats" inappropriate.

The district court overruled both objections at the sentencing hearing on April 21, 2005. With regard to the six-level enhancement, the court stated that Scott's statement to the FBI was "hard to ignore" and was sufficient to establish an intent to carry out the threat. As for the two-level enhancement, the court stated that "each letter contained a distinct, independent, separate threat, and . . . there's at least three threats contained within those letters."

The district court concluded that the PSI was accurate and that the Guidelines range was 70 to 87 months imprisonment. Additionally, it noted that neither the parties nor the PSI had identified any grounds for departure.

After determining the guidelines range the court discussed the § 3553(a) factors. The court noted that it had considered all of the factors listed in 18 U.S.C. § 3553, including "the nature and the circumstances of the offense and the history and characteristics of the Defendant." The court continued that Scott's statements to the FBI agents indicated an intent to carry out his threats against a judge, his family, federal employees, and the judicial system. It found that Scott had

6

demonstrated a "total disregard for authority and that his family was unable to control his behavior as a youth." The court also noted that as a juvenile, Scott was alleged to have committed physical and sexual abuse while in foster care and to have destroyed school property. Moreover, at eighteen, Scott had been convicted of carjacking, an offense involving a firearm. For these reasons, the court concluded that Scott's "violent past behavior" outweighed any mitigating factors such as his age or disadvantaged upbringing.

The court next considered the need for the sentence imposed to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." It found that Scott lacked respect for authority figures, could not control his anger, and had no remorse. The court concluded that a lengthy term of imprisonment would serve as adequate deterrence and, in fact, was the only adequate deterrence. The court believed that imposition of the maximum sentence was necessary to protect the public from future crimes by Scott. Accordingly, upon consideration of the 18 U.S.C. § 3553(a) factors, and taking into account the advisory nature of the Guidelines, the court concluded that the 120-month sentence was reasonable and complied with the general goals of punishment and purposes of sentencing found in § 3553(a).

Scott objected to the sentence, arguing that it was unreasonable and that he

7

had not been given notice of the court's intention to go above the guidelines range based on the § 3553(a) factors, much less the basis on which it would do so. The court responded that it had not relied on any information other than that contained in the PSI and that although the guidelines might require notice for a departure, this was "not technically a departure but a sentence outside of the Guidelines."

## II.

Pursuant to § 2A6.1(b)(2), a two-level enhancement to a defendant's base offense level is warranted if "the offense involved more than two threats." U.S.S.G. § 2A6.1(b)(2). Application note 3(B) adds that: "If the offense involved substantially more than two threatening communications to the same victim or a prolonged period of making harassing communications to the same victim, or if the offense involved multiple victims, an upward departure may be warranted." U.S.S.G. § 2A6.1, cmt. n.3(B). Scott contends that the district court erred in applying this § 2A6.1(b)(2) enhancement because he only sent two "mailings," and they do not involve "more than two threats." Specifically, he argues that the second mailing did not include multiple threats that were distinct enough in nature and purpose that they should be treated as separate ones.

This Court has never published a decision regarding the application of § 2A6.1(b)(2), but a persuasive decision of the Seventh Circuit is on point. <u>See</u>

8

United States v. Frazer, 391 F.3d 866, 870 (7th Cir. 2004). In that case Frazer recorded a message announcing that bombs were planted in two schools and on a school bus, and then he made three separate phone calls during which he played that recording. Id. at 868. He placed the first call to the superintendent's office and the second call to the high school. Id. During the second call, because he was placed on hold Frazer hung up after having played only part of the recorded threat. Id. He called back immediately and played the message in full. Id. The district court imposed a two-level enhancement pursuant to § 2A6.1(b)(2) on the ground that Frazer threatened to blow up bombs at three locations. Id. at 869.

On appeal, Frazer argued that the district court incorrectly focused on the number of victims threatened rather than counting the number of threatening acts (threatening communications or phone calls). Id. at 869. His position was that the third call should not count because it was a "de minimis 'addition'" to the second call. Id. at 868. Frazer argued that "several threats may be combined in a 'single instance or episode.'" Id. at 871.

The Seventh Circuit rejected Frazer's argument, holding that the second or third calls could not be considered de minimis because all three calls were "'true threats.'" Id. In other words, all three calls "conveyed a message that a reasonable person would foresee a recipient interpreting as an expression of intent to cause

serious harm." Id. Frazer's intent to make only two "threatening communications" was not determinative because three threats were actually made. Id.

In the course of its decision the Seventh Circuit noted that several circuit courts have associated the number of threats for § 2A6.1(b)(2) purposes with the number of communications made (telephone calls or letters). See United States v. Stokes, 347 F.3d 103, 106 (4th Cir. 2003) ("[T]he phrase 'more than two threats,' as used in § 2A6.1(b)(2), refers to the number of threatening communications, not the number of victims threatened"); United States v. Newell, 309 F.3d 396, 403 (6th Cir. 2002) (recognizing that § 2A6.1(b)(2) takes into account the number of threats made); United States v. Spring, 305 F.3d 276, 280 (4th Cir. 2002) ("threat" has the same meaning in § 2A6.1(b)(2) that it has in the underlying federal statutes that criminalize threats, e.g., 18 U.S.C. § 844(e), 18 U.S.C. § 875(c), and 18 U.S.C. § 876(c)); United States v. Goynes, 175 F.3d 350, 355 (5th Cir. 1999) (referring to § 2A6.1(b)(2) as the provision that applies to an enhancement based on multiple threats like multiple threatening letters)). We find this authority from our sister circuits logical and persuasive.

With those threat-counting decisions in mind, we conclude that the district court did not err in applying the two-level enhancement pursuant to § 2A6.1(b)(2).

There were two mailings but the second mailing contained at least two distinct threats in two letters in two envelopes. The two letters in the second mailing were contained in separate envelopes and from that the district court could infer, as it did, that Scott intended to threaten the judge twice. Not only that, but the multiple threats in the second mailing were distinct in their nature and purpose. See Stokes, 347 F.3d at 106 n.2 (stating in dicta that "[t]here may be cases in which multiple threats issued within a single letter or conversation are so distinct in nature and purpose that they should not be treated as a single threat for purposes of § 2A6.1(b)(2).") One letter in the second mailing made reference to blowing up the federal building. The other one threatened to harm the judge's children and contained white powder, which the court reasonably could infer was intended to simulate anthrax. Because Scott made at least three distinct threats, the district court did not err in finding that the two-level § 2A6.1(b)(2) enhancement did apply.

**III.**

Under U.S.S.G. § 2A6.1(b)(1), a six-level enhancement is appropriate where "the offense involved any conduct evidencing an intent to carry out" the threats. U.S.S.G. § 2A6.1(b)(1). Scott argues that the district court erred by applying this enhancement because Scott did not engage in such conduct, but instead he merely

11

made a statement to the FBI while in prison after the offense had ended.  Scott

points to the first application note to § 2A6.1(b)(1), which explains that when

determining whether this enhancement is appropriate, "the court shall consider

conduct that occurred prior to or during the offense."  U.S.S.G. § 2A6.1, cmt. n.1.

"We treat the commentary in the Sentencing Guidelines Manual as authoritative."

United States v. Searcy, 418 F.3d 1193, 1195 n.3 (11th Cir. 2005).

Whether Scott engaged in conduct evidencing an intent to carry out the

threats raises a mixed question of law and fact.  See United States v. Barbour, 70

F.3d 580, 586 (11th Cir. 1995).  "Although we review the district court's factual

findings under a clearly erroneous standard, whether the facts evidence an intent to

carry out the threat is a question of law and is reviewed de novo."  Id. (citation

omitted).  Whether a statement that was made after the threat may be considered

when determining if a defendant evidenced an intent to carry out that threat is a

pure question of law subject to de novo review.  See id. (noting that we decide  de

novo the purely legal question of whether conduct occurring before the offense

may be considered).

We are guided by our decisions in Barbour, 70 F.3d 580, and United States

v. Taylor, 88 F.3d 938 (11th Cir. 1996).  In the first case, Barbour traveled to

Washington, D.C., armed with a gun and ammunition with the intent to kill

12

President Clinton, but he left after discovering that the President was abroad. Barbour, 70 F.3d at 583. Upon his return, Barbour told several acquaintances about his trip and his desire to kill the President. Id. He was ultimately convicted of threatening the President based on the statements he made during those conversations. Id. At sentencing, the district court found that the Barbour's trip to Washington supported a six-level enhancement pursuant to § 2A6.1(b)(1). Id.

On appeal, Barbour argued that the evidence of his trip and the events that occurred during it did not prove he had an intent to carry out the threats he made after the trip. Id. at 586. We stated that under the right circumstances pre-threat conduct may be used to prove a defendant's intent to carry out a threat. Id. We listed three factors that a court could consider in determining the probative value of pre-threat conduct: (1) "the proximity in time between the threat and the prior conduct;" (2) "the seriousness of the defendant's prior conduct;" and (3) "the extent to which the pre-threat conduct has progressed towards carrying out the threat." Id. at 587. Barbour had traveled to the capital intending to kill the President and had left only after discovering that he was out of the country. Id. We reasoned that based on that conduct, "there was every reason to conclude" that Barbour intended to act on the threats he made when he returned home and that he was likely to do so. Id. We therefore concluded that the district court had

13

properly applied the six-level enhancement pursuant to § 2A6.1(b)(1).  Id.

In Taylor, the defendant was convicted of sending threatening communications through the mail, and at sentencing the district court applied the six-level § 2A6.1(b)(1) enhancement.  88 F.3d 938.  That court reasoned that the enhancement was appropriate in light of evidence that Taylor had surveilled the victims' home, called them numerous times, hired a private investigator to obtain information about them, and solicited a cell-mate to murder them.  Id. at 943.  In holding that the court properly applied the enhancement for the pre-threat conduct, we noted that "[t]he essential inquiry for § 2A6.1(b)(1) purposes is whether the facts of the case, taken as a whole, establish a sufficiently direct connection between the defendant's pre-threat conduct and his threat."  Id.  We concluded that this conduct was serious and specifically connected to the threatened parties.  Id.  We also found that these activities were closely linked with the offense of sending threatening communications through the mail.  Id.

As our Barbour and Taylor decisions indicate, and the commentary to § 2A6.1(b)(1) says, the six-level enhancement under that provision is appropriate where serious conduct committed before or during the offense indicates an intent to carry out the threat. See Taylor, 88 F.3d at 943; Barbour, 70 F.3d at 586; U.S.S.G. § 2A6.1, cmt. n.1.  Scott's statement to the FBI does not amount to that.

14

It was not conduct before or during the criminal offense but simply an answer (and a somewhat ambiguous one at that) given by Scott while in custody and in response to an investigator's question, and it occurred after the crime had been completed. The district court erred by applying the § 2A6.1(b)(1) enhancement.

Since the Supreme Court issued its decision in United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), a district court is no longer required to sentence within the guidelines range, but is still obligated to correctly calculate the range. United States v. Gibson, 434 F.3d 1234, 1243 (11th Cir. 2006); United States v. Crawford, 407 F.3d 1174, 1178–79 (11th Cir. 2005) ("[A]fter Booker, '[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.' This consultation requirement, at a minimum, obliges the district court to calculate correctly the sentencing range prescribed by the Guidelines.") (citation omitted); United States v. Shelton, 400 F.3d 1325, 1332 n.9 (11th Cir. 2005) ("A sentencing court under Booker still must consider the Guidelines, and, such consideration necessarily requires the sentencing court to calculate the Guidelines sentencing range in the same manner as before Booker."). We have noted that "[a] misinterpretation of the Guidelines by the district court effectively means that [the district court] has not properly consulted the Guidelines." Gibson, 434 F.3d at 1243 (internal

quotation marks and citation omitted).

Notwithstanding the district court's error, we are not required to vacate the sentence and remand the case if the court would have likely sentenced Scott in the same way without the error. See Williams v. United States, 503 U.S. 193, 203, 112 S. Ct. 1112, 1120–21 (1992) ("[O]nce the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed."); United States v. Williams, 431 F.3d 767, 775 (11th Cir. 2005) (Carnes, J. concurring) ("The Supreme Court and this Court have long recognized that it is not necessary to decide guidelines issues or remand cases for new sentence proceedings where the guidelines error, if any, did not affect the sentence."); United States v. Blas, 360 F.3d 1268, 1272–73 (11th Cir. 2004) (declining to decide whether the district court misapplied the guidelines where the district court would have reached the same sentence regardless of any error).

If the district court had not erroneously applied the six-level enhancement, Scott would have had an offense level of 17. That level, when combined with a criminal history category of IV, would have placed him in the guidelines range of 37 to 46 months, instead of the range of 70 to 87 months. The district court

sentenced Scott to 120 months. Even though the district court spent a considerable amount of time explaining why Scott deserved the maximum sentence, we cannot say that the court, had it known of the appropriate range, would have sentenced Scott to the same severe sentence. The primary reason for our reluctance to do so is the substantial difference between the correct range and the one that was erroneously used as guidance. The top of the correct range (46 months) is just over half the top of the wrong range (87 months). The step from 46 months to 120 months is significantly greater than the step from 87 months to 120 months. Because it is unclear how the court would have acted, we must vacate the sentence and remand to the court for re-sentencing on this ground. In taking this action, we note that if it had wished to do so the district court could have stated that it would reach the same sentence regardless of how the disputed § 2A6.1(b)(1) issue was decided. A statement like that would have convinced us the error was harmless. See Williams, 431 F.3d at 775 (Carnes, J., concurring).

In vacating the sentence and remanding for a new sentence proceeding, we do not mean to imply that the district court on remand cannot reach the same sentence as it did before, provided that it corrects the one error identified in this opinion. Nor do we imply any view on issues that may arise for the first time at the re-sentencing.

## IV.

Scott's third contention is that the district court should have informed him before the sentence hearing that it was contemplating sentencing him above the guidelines range based on the § 3553(a) factors, and should have given him notice of the grounds for doing so. He relies on the reasoning of Burns v. United States, 501 U.S. 129, 111 S. Ct. 2182 (1991), and the analogy that Fed. R. Crim. P. 32(h) provides, while the government in opposition cites the reasoning and language of United States v. Hofierka, 83 F.3d 357 (11th Cir. 1996). It is an interesting issue, but one that we have no occasion to decide in this case. Because we are reversing Scott's sentence as a result of the § 2A6.1(b)(1) error and remanding the case to the district court for re-sentencing, any lack of notice at the original sentencing will not matter. In light of what happened at the first sentencing, Scott is on notice that the district court may sentence him above the guidelines range and of the grounds it may use to do so. For that reason, the notice issue has no remaining relevance to this case.

## V.

The sentence is VACATED and the case is REMANDED for further proceedings consistent with this opinion.