**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**October 6, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

WILLIAM MITCHELL CHAPPLE,

     Defendant-Appellant.

No. 05-7103

(D.C. No. CR-04-106-P)
(E. D. Oklahoma)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE, BALDOCK,** and **BRORBY**, Circuit Judges.

---

Defendant William Chapple was convicted of two counts of mailing a threatening

communication in violation of 18 U.S.C. § 876(c), and was sentenced to a term of

imprisonment of 33 months. Chapple now appeals his sentence, claiming the district

court committed plain error when it treated his two convictions as separate "groups"

under Chapter 3 of the Sentencing Guidelines. We exercise jurisdiction pursuant to 28

U.S.C. § 1291 and remand with directions to vacate Chapple's sentence and resentence.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

I.

On October 1, 2004, a manila envelope post-marked from Colorado Springs, Colorado, was delivered by the United States Postal Service to the addressee, Cannarsa Investments (CI), in Muskogee, Oklahoma. A CI employee, Anne Alcorn, noticed that the envelope contained, and was leaking, some type of powder. Alcorn, at the suggestion of the Postal Service, contacted the Muskogee Police Department (MPD). The MPD took possession of the envelope and submitted it to the Oklahoma Department of Health laboratory for analysis. The powder was determined not to be biohazardous.

On October 4, 2004, a second manila envelope addressed to CI, but post-marked from Syracuse, Kansas, was intercepted by employees at the Muskogee Post office. Like the first envelope, the second envelope was believed to contain an unknown substance. A postal inspector transported the envelope to the Oklahoma Department of Health Laboratory for analysis. As with the powder contained in the first envelope, the powder contained in the second envelope was determined to be non-biohazardous.

A postal inspector began investigating the matter and, in doing so, interviewed Christine Cannarsa, the owner of CI. Cannarsa advised that she believed the sender of the envelopes might be William Chapple, a former classmate of hers. According to Cannarsa, Chapple had been "stalking" her for approximately two years in an attempt to establish a romantic relationship with her. Cannarsa further indicated she had previously filed reports with the MPD regarding Chapple and had also had an attorney mail correspondence to Chapple requesting that he stop sending communications to Cannarsa.

The postal inspector then contacted and interviewed Chapple. Although Chapple initially denied mailing the envelopes and asserted that Cannarsa had been stalking him, he ultimately confessed to sending the two manila envelopes to CI. Chapple indicated that the powder contained in the envelopes came from a broken road flare. Chapple further indicated that his intent in sending the envelopes was to scare Cannarsa.

On November 9, 2004, Chapple was indicted on two counts of mailing a threatening communication in violation of 18 U.S.C. § 876(c). Specifically, each count charged Chapple with "knowingly caus[ing] to be delivered by the Postal Service . . . an envelope containing a white, granular powder, . . . addressed to [CI], . . . and which . . . was intended to be a threat to injure the person of Christina Cannarsa." ROA, Vol. I, Doc. 2 at 1. The case proceeded to trial in July 2005, and Chapple was convicted by a jury on both counts. A presentence report (PSR) was prepared assigning Chapple a total offense level of 14. In making this determination, the PSR first separately calculated offense levels of 12 for each of the two counts of conviction, and then, in reliance on U.S.S.G. § 3D1.4(a), applied a two-level upward adjustment, resulting in a "combined offense level" of 14. Together with Chapple's criminal history category of IV, this offense level resulted in a Guideline range of 27 to 33 months. Neither Chapple nor the government objected to the PSR's method of calculating the offense level or the Guideline range. The district court accepted the PSR's Guideline calculations and sentenced Chapple to a term of imprisonment of 33 months.

II.

Chapple raises a single issue on appeal: whether the district court committed plain error by failing to group the two counts of conviction for purposes of calculating his Guideline offense level. According to Chapple, the district court should have treated his two counts of conviction as one "group" under U.S.S.G. § 3D1.2, and in turn should not have imposed a two-level increase to his offense level under U.S.S.G. § 3D1.4.

Generally speaking, we are "required," consistent with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), "to review district court sentencing decisions for reasonableness." United States v. Cage, 451 F.3d 585, 590 (10th Cir. 2006) (internal quotation marks omitted). Because, however, Chapple did not challenge the district court's application of the Guidelines at the time of sentencing, we review the district court's decision under a plain error standard. See United States v. Lopez-Flores, 444 F.3d 1218, 1221 (10th Cir. 2006). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. at 1222 (internal quotation marks omitted).

It is uncontroverted that, for purposes of sentencing, Chapple's two convictions for violating 18 U.S.C. § 876(c) fall within the scope of U.S.S.G. § 2A6.1, entitled "Threatening or Harassing Communications." Section 2A6.1(a) establishes a base offense level of 12 for such crimes. The question at issue here is how the grouping rules under Chapter 3 of the Sentencing Guidelines should be applied, and whether those rules

require a two-level enhancement to the base offense level set forth in § 2A6.1.

"The Introductory Commentary" to Chapter 3 "indicates that the grouping rules are meant to serve at least two main objectives." United States v. Nedd, 262 F.3d 85, 90 (1st Cir. 2001). "One such objective is to bundle multi-count indictments into sets of counts that share the same harm or can be otherwise characterized as the same type of wrongful conduct in order 'to provide incremental punishment for significant additional criminal conduct.'" Id. (quoting U.S.S.G. Ch. 3, Pt. D, introductory cmt.). "'Some offenses that may be charged in multiple-count indictments are so closely intertwined with other offenses that conviction for them ordinarily would not warrant increasing the guideline range.'" Id. A second "objective of the guidelines' grouping rules is to limit the effect of prosecutorial choices in the design of the indictment which, by charging multiple offenses intend to exact (or threaten) greater punishment but which, nevertheless, may be fairly characterized with fewer counts and thus punishable by a less severe sentence." Id. at 91.

Section 3D1.1 outlines generally how Chapter 3's grouping rules are to be applied:

(a) When a defendant has been convicted of more than one count, the court shall:
    (1) Group the counts resulting in conviction into distinct Groups of Closely Related Counts ("Groups") by applying the rules specified in § 3D1.2.
    (2) Determine the offense level applicable to each Group by applying the rules specified in § 3D1.3.
    (3) Determine the combined offense level applicable to all Groups taken together by applying the rules specified in § 3D1.4.

U.S.S.G. § 3D1.1.

Following these procedures, the PSR, and in turn the district court, concluded that § 3D1.2 required Chapple's two convictions to be treated as separate "groups." More specifically, the PSR stated as follows:

> As provided in Chapter 3, Part D of the Guidelines, when a defendant has been convicted of more than one count, multiple count grouping rules are applied in order to determine a single offense level. However, in this case the applicable chapter for determining the offense level is Chapter 2A of the guidelines. According to U.S.S.G. § 3D1.2(d) all offenses found in Chapter Two, Part A are specifically excluded from the grouping rules. Therefore, each Count of conviction shall have independent guideline calculations as required in U.S.S.G. § 3D1.3 and the combined offense level shall be completed in accordance with U.S.S.G. § 3D1.4.

ROA, Vol. IV at 5. Pursuant to U.S.S.G. § 3D1.4, the PSR, and in turn the district court, treated each "group" as a separate "unit," and imposed a two-level enhancement to Chapple's offense level due to the presence of two "units."

Chapple contends the district court erred in concluding that § 3D1.2(d) required his convictions to be excluded from the grouping rules. We agree. Section 3D1.2 provides, in pertinent part, as follows:

> All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
>
> * * *
>
> (b)  When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
>
> * * *
>
> (c)  When the offense level is determined largely on the basis of the total

amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

Offenses covered by the following guidelines are to be grouped under this subsection:

> §§ 2B1.1, 2B1.4, 2B1.5, 2B4.1, 2B5.1, 2B5.3, 2B6.1;
> §§ 2C1.1, 2C1.2, 2C1.7, 2C1.8;
> §§ 2D1.1, 2D1.2, 2D1.5, 2D1.11, 2D1.13;
> §§ 2E4.1, 2E5.1;
> §§ 2G2.2, 2G3.1;
> § 2K2.1;
> §§ 2L1.1, 2L2.1;
> § 2N3.1;
> § 2Q2.1;
> § 2R1.1;
> §§ 2S1.1, 2S1.3;
> §§ 2T1.1, 2T1.4, 2T1.6, 2T1.7, 2T1.9, 2T2.1, 2T3.1.

*Specifically excluded from the operation of this subsection are:*

> *all offenses in Chapter Two, Part A;*
> * * *

For multiple counts of offenses that are not listed, grouping under this subsection may or may not be appropriate; a case-by-case determination must be made based upon the facts of the case and the applicable guidelines (including specific offense characteristics and other adjustments) used to determine the offense level.

*Exclusion of an offense from grouping under this subsection does not necessarily preclude grouping under another subsection.*

U.S.S.G. § 3D1.2 (emphasis added). Contrary to the conclusion apparently reached by

the PSR and the district court, subsection (d) does not exclude offenses falling within the

scope of Chapter Two, Part A from being grouped together under <u>any</u> subsection of §

3D1.2. Rather, subsection (d) merely excludes such offenses from being grouped together under "this subsection," i.e., subsection (d). Indeed, subsection (d) expressly notes that the "[e]xclusion of an offense from grouping under this subsection does not necessarily preclude grouping under another subsection." Thus, nothing in subsection (d) precluded Chapple's two counts of conviction from being grouped together under subsection (b).

The government argues, however, that Application Note 2 of U.S.S.G. § 2A6.1 effectively prevents Chapple's two counts of conviction from being grouped together. That Application Note provides as follows:

> Grouping. – For purposes of Chapter Three, Part D (Multiple Counts), multiple counts involving making a threatening or harassing communication to the same victim are grouped together under § 3D1.2 (Groups of Closely Related Counts). Multiple counts involving different victims are not to be grouped under § 3D1.2.

U.S.S.G. § 2A6.1 cmt. n.2. The government argues that "the threat contained in" each of Chapple's mailings "was communicated to more than one individual, thereby producing multiple victims of [each] communication," and in turn precluding the grouping of Chapple's two convictions. Govt. Br. at 6. More specifically, the government asserts there were two victims, i.e., Christine Cannarsa, the owner of CI, and Anne Alcorn, the CI employee who accepted receipt of the first envelope and, after noticing it was leaking powder, contacted the authorities (it should be noted that the government does not indicate whether it believes both women were victims of only the first mailing, or also the second mailing).

We reject the government's argument. To begin with, Application Note 2 to §

2A6.1 does nothing more than summarize how the grouping rules set forth in § 3D1.2

apply to convictions for sending threatening or harassing communications. Thus, the best

measure of how the grouping rules are to work is § 3D1.2 itself. Turning directly to that

section, Application Note 2 thereto provides as follows:

> The term "victim" is not intended to include indirect or secondary victims.
> Generally, there will be one person who is directly and most seriously
> affected by the offense and is therefore identifiable as the victim. * * *
> Ambiguities should be resolved in accordance with the purpose of this
> section as stated in the lead paragraph, i.e., to identify and group "counts
> involving substantially the same harm."

U.S.S.G. § 3D1.2 cmt. n.2. Applying those principles here, it is undisputed that, as noted

the PSR, "Christine Cannarsa was the intended recipient of the packages," and thus was

the person "who [wa]s directly and most seriously affected by the offense[s] . . . ." ROA,

Vol. IV at 3. Indeed, it is undisputed that Ms. Cannarsa was the person Chapple had been

stalking and who Chapple was seeking to threaten/intimidate. Although the PSR also

notes that "Anne Alcorn came into contact with the initial package during the course of

her regular duties," and has experienced anxiety as a result of that contact, nothing in the

record indicates that she was an intended target of Chapple's threatening conduct. Thus,

we conclude that Alcorn is properly classified as an "indirect or secondary victim," and

should not have been taken into account for purposes of the grouping rules.[1] See United

---

[1] Even assuming, for purposes of argument, that both Cannarsa and Alcorn could
reasonably be viewed as direct or primary victims, they presumably must be treated in an
equivalent manner. That is, they presumably must either be treated as victims of (a) only
the first mailing, or (b) of both mailings. In other words, there were not, in the words of

States v. Norman, 951 F.2d 1182, (10th Cir. 1991) (concluding that airline that received calls from the defendant was not a victim for purposes of Chapter 3's grouping rules; also concluding that defendant's scheme was motivated solely by a desire to "bring grief" to a single airline passenger); United States v. Wilson, 920 F.2d 1290, 1294 (6th Cir. 1990) (concluding there was only one primary victim of the defendant's series of telephone calls seeking to obtain a "hit man" to murder his wife). In turn, we conclude Chapple's two counts of conviction involved "substantially the same harm" and should have been treated as one group pursuant to § 3D1.2(b). See Nedd, 262 F.3d at 94 (concluding that two separate acts of threatening behavior toward the same primary victims should be treated as one group under Chapter 3).

Having concluded that the district court erred in its application of § 3D1.4, the burden remains on Chapple to establish that the error affected his substantial rights. In this regard, Chapple notes that the two-level enhancement that resulted from the district court's error increased his guideline range from 21-27 to 27-33 months. And, because the district court ultimately imposed a sentence of 33 months, Chapple argues that the district court's error, at a minimum, resulted in him receiving a sentence six months longer than he otherwise would have absent the error. We find Chapple's arguments persuasive. In terms of reasonableness, it is clear that the district court's improper grouping of the two

Application Note 2 to § 2A6.1, "different" victims of the two mailings (the two mailings were identical in that they were both addressed to CI; the only difference is that the second mailing was intercepted by postal workers and was never actually delivered to CI's offices).

counts of conviction increased Chapple's sentence by at least six months beyond what it should have been. Thus, it is evident that the district court's error affected the outcome of Chapple's sentencing proceeding.

That leaves only the question of whether the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. In this regard, the sentence actually imposed by the district court on Chapple is clearly outside of the "national norm" established by the Guidelines for the crimes of conviction. United States v. Gonzalez-Huerta, 403 F.3d 727, 738 (10th Cir. 2005). Further, there appears to be a reasonable likelihood that, if the case were to be remanded for resentencing, Chapple would receive a sentence at least six months less than the one actually imposed by the district court. In other words, the "correct application of the sentencing laws would . . . significantly reduce the length of [Chapple's] sentence." United States v. Brown, 316 F.3d 1151, 1161 (10th Cir. 2003). Thus, we conclude the fourth prong of the plain error test has been satisfied, allowing us to exercise our discretion to correct the district court's plain error.

The case is REMANDED with directions to vacate Chapple's sentence and resentence him.

Entered for the Court


Mary Beck Briscoe
Circuit Judge