FILED
United States Court of Appeals
Tenth Circuit

December 16, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

MICHAEL E. PARKER,

        Defendant-Appellant.

No. 07-3364

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 2:07-CR-20063-KHV-1)**

---

Submitted on the briefs:[*]

Jeffrey D. Morris, Berkowitz, Oliver, Williams, Shaw & Eisenbrandt, LLP, Kansas City, Missouri, for Defendant-Appellant.

Eric F. Melgren, United States Attorney, David C. Smith, Assistant United States Attorney, Kansas City, Kansas, for Plaintiff-Appellee.

---

Before **HENRY**, Chief Judge, **EBEL** and **GORSUCH**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Michael E. Parker appeals his two-count conviction and resulting 85-month sentence for using a cell phone to convey false information about alleged attempts to blow up certain buildings. He argues that (1) the district court abused its discretion in admitting voice-identification evidence; (2) there was insufficient evidence to support the jury's guilty verdicts; and (3) the sentence is procedurally unreasonable. Our jurisdiction arises under 18 U.S.C. § 3742 and 28 U.S.C. § 1291. We affirm.

## BACKGROUND

On the morning of April 19, 2007, between 5:15 a.m. and 8:09 a.m., the Douglas County, Kansas, Emergency Communications Center (Dispatch) received nine 911 calls from an unidentified male using one cell phone. The first four calls were inaudible. During the fifth call, which was received at 6:46 a.m., the caller mentioned placing a bomb in a school:

| | |
|---|---|
| Dispatch: | Douglas County 911. What is the address of the emergency? |
| [Caller]: | Going to put a bomb in one of the schools today. |
| Dispatch: | What school? |
| [Caller]: | Going to be a murder today. |

R., Vol. 6 at 4. Only minutes later, in his sixth call, he stated that a school and possibly a city hall would be blown up:

| | |
|---|---|
| Dispatch: | Douglas County 911. What is the address of the emergency? |
| [Caller]: | He's going to blow up a school today. |
| Dispatch: | Where is he going to blow it up? |

> [Caller]: He's going to blow up a school today.
> Dispatch: What school?
> [Caller]: At City Hall.

*Id.* The seventh call, at 7:42 a.m., described the type of bomb:

> Dispatch: Douglas County 911. What is the address
> of the emergency?
> [Caller]: He's got a pipe bomb. Pipe bomb.

*Id.* The eighth call came in at 7:51 a.m., and referenced both pipe bombs and schools:

> Dispatch: Hello. Hello. Douglas County 911. What
> is the address of the emergency? Hello?
> [Caller]: Inaudible.
> Dispatch: Are you there?
> [Caller]: They got pipe bombs. They got pipe bombs.
> Dispatch: Who has pipe bombs?
> [Caller]: (Inaudible) schools today. They got pipe bombs.

*Id.* The ninth and final call came in at 8:07 a.m., and was inaudible.

Police quickly learned that the cell phone's number was registered to Sara Little. Unable to locate Little, the police had the telephone company "ping[ ]" Little's phone at 8:30 a.m. to determine its location. *Id.*, Vol. 3 at 296. The ping placed the phone "in the location of 12th and New York in Lawrence, Kansas, with the certainty level of nine meters." *Id.* Police responded to the area at 8:40 a.m. and assumed surveillance positions around a building composed of several apartment units.

At approximately 9:10 a.m., Detective Mike McAtee and Officer Sam Harvey knocked on the door to Parker's apartment. Parker spoke with them for a

few minutes through the door, and then allowed them inside, where he was alone; but he declined to allow them to search the apartment for the phone. Detective McAtee left to obtain a search warrant. While he was gone, Detective McAtee called the cell phone, which Officer Harvey and other officers in Parker's apartment heard ringing inside Parker's recliner.

After the search warrant was obtained, officers recovered Little's cell phone from the recliner. They ascertained that, in addition to the 911 calls, there were also several calls to Parker's former girlfriend around 8:00 a.m., but the calls did not go through. The last call made from the phone, which was to a business number, ended only seconds before Detective McAtee and Officer Harvey knocked on Parker's door at 9:10 a.m.

Parker agreed to an interview. He denied making the calls to 911 and he stated that Little, Sarah Coleman, and others had been in his apartment the prior evening. Additionally, he claimed that he passed out at 11:00 p.m. and awoke alone at 7:00 a.m. While Parker was being interviewed, police also questioned Coleman, who had earlier learned from Little that Parker was suspected of making bomb threats with Little's cell phone. Coleman listened to the 911 tapes and identified the caller with "100%" certainty as Parker. *Id.*, Vol. 4 at 130.

Parker was arrested and indicted on two counts of threatening to blow up, or alternatively, falsely conveying information about an attempt to blow up, a building, in violation of 18 U.S.C. § 844(e). The first count identified "a school

-4-

and city hall" as targets, whereas the second count merely stated, "a school." R., Vol. 1, Doc. 1 at 1-2.

At trial, Detective McAtee recounted his investigation of the 911 calls. Detective M.T. Brown testified that he interviewed Parker on April 19. The interview was played for the jury. Defense counsel cross-examined Detective Brown about why he repeatedly asked Parker "to explain himself" during the interview. *Id.*, Vol. 4 at 252. In response, Detective Brown appeared to opine that it was Parker's voice on the 911 tapes: "[I]t probably came sometime after [Parker] had indicated he was the only one there [in the apartment] and I heard the phone call - - I heard the voice." *Id.*

Coleman testified that she had known Parker for "ten, 15 years," *id.* at 100, that on April 18, 2007, she, Little, and Parker were in his apartment smoking crack cocaine, and that she left around 9:00 p.m, after Little had departed and left her phone in the apartment. The government played the 911 tapes in open court, and Coleman again identified the voice as Parker's. She admitted, however, that Parker had phoned her two months before trial and she mistook his voice for a "Rico" when she was "drunk and high." *Id.* at 111, 114.

Little testified that she and Parker were "really good friends." *Id.* at 67. She stated that on April 18, she, Coleman, and Parker were smoking crack cocaine in Parker's apartment. She departed around 7:15 p.m., leaving various items behind, including her cell phone. After learning that her phone had been

used to make the bomb threats, Little evaded police until she was arrested several months later on a probation violation. When police finally asked her to identify the voice on the 911 tapes, she was aware that Parker was soon to go on trial for the calls. She identified Parker's voice as the voice making the threats. The prosecutor played the 911 calls for Little in open court, and she again identified Parker as the caller.

The defense's theory of the case centered on the fact that Parker lived in a high crime area and that the police failed to pursue other possible suspects. Parker testified that after Little and Coleman left his apartment on April 18, other people came by to consume drugs and alcohol. According to Parker, he did not know Little's phone had been left in his apartment and he did not make the 911 calls.

The jury instructions indicated that count one of the indictment, listing the targets as "a school and city hall," was premised on the sixth 911 call. *Id.*, Vol. 1, Doc. 33 at 16. The instructions also indicated that count two, which listed the target as "a school," was based on the fifth, seventh, and eighth 911 calls. *Id.* at 17. The jury found Parker guilty on the alternative counts (falsely conveying information about an attempt to blow up buildings), insofar as the counts concerned the fifth, sixth, and eighth calls. Parker was found not guilty for the seventh call.

The United States Probation Office prepared a presentence investigation report (PSR), calculating a 77 to 96 month guidelines range based on an offense level of twenty-two and a category V criminal history. Parker objected to the PSR's offense-level calculation, which employed a two-level enhancement for offenses that involved more than two threats, U.S.S.G. § 2A6.1(b)(2), and a two-level upward adjustment for the multiple counts, U.S.S.G. § 3D1.4. The district court overruled the objections and imposed an 85-month sentence on each count, to be served concurrently. Parker appealed.

## DISCUSSION

### I. Voice-Identification Evidence

Parker argues that the district court should not have "permitted Detective Brown to opine that he believed the voice on the 911 calls" was Parker's voice. Aplt. Br. at 18. "We review the district court's ruling admitting evidence for an abuse of discretion if an objection is timely made, but if no objection is made, for plain error." *United States v. Castorena-Jaime*, 285 F.3d 916, 931 (10th Cir. 2002). Although Parker claims that he objected to this evidence, and the government seems to agree, we cannot find any such objection in the record. The only objection that we can find is Parker's objection to Detective Brown offering his opinion that the voice on the 911 calls did not match Parker's *neighbor's* voice. *See* R., Vol. 4 at 284. Further, Parker's own counsel seems to have elicited Detective Brown's opinion about Parker's voice while cross-examining

-7-

him about the interview. *See id.* at 252. A party may not, however, induce action during trial and later seek reversal on the ground that the action was error. *See United States v. Deberry*, 430 F.3d 1294, 1301-02 (10th Cir. 2005).

But even if Detective Brown's voice identification was spontaneous and not invited by Parker's counsel, he has not established any error, let alone plain error. Specifically, a lay witness need only be "minimal[ly] familiar[ ]" with a defendant's voice before offering an identification. *United States v. Zepeda-Lopez*, 478 F.3d 1213, 1219 (10th Cir. 2007) (quotation omitted). Detective Brown acquired the requisite familiarity with Parker's voice during his interview with Parker, which lasted about four hours. *Cf. id.* (observing that "a single telephone call, combined with hearing a voice in court, is sufficient for voice identification testimony to go to the jury"). Nevertheless, Parker challenges Detective Brown's voice identification on the basis that Brown had concluded, before hearing the 911 calls, that Parker was the culprit. But this challenge goes to the weight of the identification, not its admissibility. *See United States v. Bush*, 405 F.3d 909, 917, 919 (10th Cir. 2005) (stating that once minimal familiarity is satisfied, it is for the jury to assess other evidence that may undermine the credibility of identification testimony). The voice identification evidence was properly admitted.

## II.  Sufficiency of the Evidence

Parker argues that there was insufficient evidence to prove that he made the 911 calls.  "Whether the government presented sufficient evidence to support a conviction is a legal question that we review de novo."  *United States v. Zapata*, 540 F.3d 1165, 1174 (10th Cir. 2008) (quotation omitted).  In conducting our review, "we view the record in the light most favorable to the government to determine whether a reasonable jury could find the defendant guilty beyond a reasonable doubt."  *Id.*  Further, "[w]e do not weigh conflicting evidence or make credibility determinations, as these are exclusively functions of the jury."  *Id.*

We conclude that there was ample evidence to support Parker's conviction. The cell phone on which the calls were made was found in Parker's apartment, inside his recliner.  A call that was made from that phone to a business number ended only seconds before police knocked on Parker's door and found him inside, alone.  Even when interviewed by police, Parker indicated that he had been alone in the apartment since at least 7:00 a.m. —the last three 911 calls occurred after that time.  Other calls to Parker's girlfriend occurred around the time of the final two 911 calls.  Further, both Coleman and Little, who were well-acquainted with Parker, identified Parker's voice on the 911 calls before trial and again during trial.[1]  Finally, because the jury had the opportunity to hear the 911 calls, Parker's

---

[1]     While Coleman misidentified Parker's voice as "Rico" when he called her several months before trial, Coleman explained that she was "drunk and high" at

(continued...)

interview with police, and Parker's in-court testimony, it was in a good position to evaluate the testimony of the various witnesses and to render a verdict about the caller's identity. Parker's challenge to the sufficiency of the evidence is without merit.

## III.  Sentencing

"We review sentences for reasonableness under a deferential abuse of discretion standard." *Zapata*, 540 F.3d at 1178 (quotation omitted). Reasonableness has both procedural and substantive components. *Id.* Parker raises only procedural reasonableness.[2] "A sentence is procedurally unreasonable if the district court incorrectly calculates or fails to calculate the Guidelines sentence, treats the Guidelines as mandatory, fails to consider the [18 U.S.C.] § 3553(a) factors, relies on clearly erroneous facts, or inadequately explains the

---

[1](...continued)
the time. R., Vol. 4 at 111. When Coleman identified Parker's voice at trial, however, she was sober. Also, we are not persuaded that Parker's conviction is unreliable because Coleman and Little knew when they first identified Parker's voice that he was the suspect. Although Coleman's and Little's knowledge could have made their identification of Parker's voice more likely, their identifications were consistent with the other evidence that pointed to Parker as the caller. "Rather than examining the evidence in bits and pieces, we evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole." *United States v. Gallant*, 537 F.3d 1202, 1222-23 (10th Cir. 2008) (quotations omitted).

[2]     Although Parker's appellate brief mentions substantive unreasonableness, Aplt. Br. at 17-18, his accompanying argument simply restates his procedural claims.

sentence." *Id.* (quotation omitted). "When considering the calculation of a

Guidelines sentencing range, we review legal questions de novo and we review

any factual findings for clear error, giving due deference to the district court's

application of the Guidelines to the facts." *United States v. Gambino-Zavala*,

539 F.3d 1221, 1227-28 (10th Cir. 2008) (quotation and brackets omitted).

Parker argues that he did not qualify for U.S.S.G. § 2A6.1(b)(2)'s 2-level

enhancement for an "offense involv[ing] more than two threats." He contends

that the 911 calls merely advanced one or maybe two distinct threats. Aplt. Br. at

17. It is generally understood, however, that threats are counted under

§ 2A6.1(b)(2) based on the number of threatening *communications*. *See United*

*States v. Scott*, 441 F.3d 1322, 1327 (11th Cir. 2006); *United States v. Frazer*,

391 F.3d 866, 870-71 (7th Cir. 2004); *United States v. Stokes*, 347 F.3d 103, 106

(4th Cir. 2003). Here, the jury found Parker responsible for three of the

threatening 911 calls. Accordingly, he qualified for the § 2A6.1(b)(2)

enhancement.[3]

Parker also argues that the two counts on which he was convicted should

have been grouped together, so he would not have received a two-level upward

adjustment to his offense level. Specifically, because the two counts in this case

---

[3] Because there were more than two threatening communications, we need not decide whether the district court properly found multiple threats in each of the three 911 calls based on multiple schools and a city hall. *See Frazer*, 391 F.3d at 871 (declining to decide whether multiple threats arise under § 2A6.1(b)(2) when different bombing locations are mentioned).

were not grouped together, and they were within four offense levels of each other, "[t]he combined offense level [was] determined by taking the offense level applicable to the [count] with the highest level and increasing that offense level by" two levels. U.S.S.G. § 3D1.4(a). But no upward adjustment would have been available if the two counts had been combined into a single group. *See* U.S.S.G. § 3D1.4; *United States v. Tolbert*, 306 F.3d 244, 246 (5th Cir. 2002).

Under U.S.S.G. § 3D1.2, counts must be grouped together when they involve "substantially the same harm." This occurs, for example, when the "counts involve the same victim" and one or more common acts. U.S.S.G. § 3D1.2(a) & (b). But when there are multiple victims who are "directly and seriously affected by the offense," grouping is not appropriate. U.S.S.G. § 3D1.2, application note 2; *see also id.* § 2A6.1, application note 2 (stating that "multiple counts involving making a threatening or harassing communication to the same victim are grouped together . . . [but] [m]ultiple counts involving different victims are not to be grouped").

The district court found that the 911 calls targeted multiple victims, in that Parker mentioned "school," "schools," and "City Hall." *See* R., Vol. II at 53. The PSR indicated that in Douglas County, Kansas, there are four city halls and thirty-nine public schools. The PSR also reported: the 911 calls caused many of the schools to go into lockdown mode; thousands of students left or were picked-up by their parents; police officers were dispatched to various schools and

-12-

city buildings; security personnel conducted vehicle and building-to-building bomb searches; and six schools cancelled after-school programs.

We have little difficulty concluding that the two counts on which Parker was convicted directly and seriously affected the schools and city halls throughout the county. That there were multiple victims is also clear. At the very least, the "school" listed in count one and the "school" listed in count two qualify as different victims, given the number of schools in the county, Parker's failure to specify any particular school, and Parker's reference in the eighth call to "schools." Further, count one's "city hall" and count two's "school" qualify as different victims of the 911 calls, as they would be different entities. While Parker's reference to "At City Hall" could be interpreted as simply supplying the location of a school to be blown up, nothing in that or the other befuddled calls excludes "City Hall" as a separate target. Accordingly, we conclude that the district court appropriately separated the two counts and applied the § 3D1.4 upward adjustment.[4]

---

[4]     Parker's reliance on *United States v. Chapple*, 198 F. App'x 745 (10th Cir. 2006) (unpublished), is misplaced. *Chapple* involved threatening packages sent to a company, the intended recipient being the company's owner. We held that the district court erred when it created one § 3D1.2 group for the owner and a separate group for an employee who handled one of the incoming packages. Because the employee was merely an "indirect or secondary victim," she "should not have been taken into account for purposes of the grouping rules." *Id.* at 751 (quotation omitted). Here, in contrast, there were multiple intended targets of the threatening 911 calls. Consequently, the two counts on which Parker was convicted could not have been grouped together. *Cf. United States v. Nedd*,

(continued...)

## CONCLUSION

The judgment and sentence of the district court are AFFIRMED.

---

[4](...continued)
262 F.3d 85, 92-93 (1st Cir. 2001) (holding that four threatening calls produced three primary victims, notwithstanding the fact that each of the calls shared a common target and criminal objective).