**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 7, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MELISSA JORDAN,

Defendant - Appellant.

No. 14-1377
(D.C. No. 1: 13-CR-00014-RBJ-1)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **O'BRIEN**, and **PHILLIPS**, Circuit Judges.

When does a judge's background and experience create an appearance of bias or

prejudice necessitating recusal under 28 U.S.C. § 455(a)?  When an evaluation of all

known circumstances considered from the objective, global perspective of a

knowledgeable observer would require it.  Articulating the test is sometimes less difficult

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A).  Citation to unpublished decisions is not prohibited.  Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value.  10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished).  *Id.*

than applying it. But not here.

Melissa Jordan used Facebook[1] to announce her plan for mass murder of horrific proportions in Littleton, Colorado. Others were invited to participate and/or observe: "Join me on September 14th [2012] and kill as many people as possible." (R. Vol. 1 at 28.) It referenced two recent mass shootings in the Denver area, James Holmes' theater shooting in Aurora and, with even greater emphasis, the 1999 Columbine High School tragedy. Both of those shootings were devastating, in varying degree, to families, responders, schools, communities, the state and the nation; they remain hot button issues.

She pled guilty to a federal felony. The sentencing judge had no extra-judicial knowledge of this case. But, being a former state trial judge from the Denver area, he had both personal and professional connections with the Columbine shooting, which he dutifully disclosed to all concerned. When it came time for sentencing he varied downward from the sentencing guidelines, which recommended incarceration for 15-21 months, and imposed 6 months imprisonment followed by three years supervised release. But even that modest sentence was too much for defense counsel, the government, the probation officer, and Jordan's treating psychologist, all of whom recommended against any incarceration.

Because of the judge's knowledge about the Columbine shooting and his

---

[1] Given its popularity, Facebook needs little explanation. But, for the uninitiated, it is a free, vibrant social networking website which permits registered users to do a host of things, among them: posting and reading comments, events, news, and, in general, communicating with "friends" and others.

unwillingness to go along with the sentencing recommendation of others, Jordan claims a recusal was required. But an objective consideration of all of the relevant facts reveal a judge who scrupulously, properly, and publically considered and rejected the claim of an appearance of bias and then imposed condign punishment. Sentencing is not a committee activity, but one committed to the informed, and often lonely, discretion of one judge—it is uniformly difficult. We affirm.

## I. Background

### A. Offense conduct

On July 20, 2012, James Holmes entered a movie theater in Aurora and began shooting. He killed twelve people and injured dozens more. The next day, Jordan created an event entitled "KILLING SPREE" using a Facebook account she created. (Supp. R. at 8.) To the account, she assigned the name "Eric Rebdomine," a nickname of one of the high school students (Eric Harris) who carried out the mass shooting at Columbine High School. (*Id.*) The "KILLING SPREE" event was to occur on September 14, 2012, from 12:15 a.m. to 1:00 a.m., in Littleton, Colorado, the home of Columbine High School. The event invited others who were Facebook "friends" with "Eric Rebdomine" to the event: "Join me on September 14th and kill as many people as possible." (R. Vol. I at 28.) These "friends" could in turn invite their "friends" and so on. In the end, 180 people were invited and 37 said they were coming.[2]

---

[2] Many, but not all, of the Facebook users invited to the event were alias accounts also controlled by Jordan.

In addition to the "KILLING SPREE" event, Jordan posted other disturbing statements on the "Eric Rebdomine" account:

May 22, 2012: "Zero Day[3] is my only ambition in life."

June 17, 2012: "There are only two things I'm going to worry about when zero day comes. Not killing enough people and surviving my suicide attempt."

July 8, 2012: "I'll show you what it's like to be hated. Maybe when you're lying on the fucking floor in a puddle of your own blood. Maybe then you'll understand. I'm the one holding the gun. I have the power now. I'm the one laughing in your face as I pull the trigger."

July 10, 2012: "When there is a gun pointed at your face, you'll be sorry."

July 10, 2012: "The people I used to call my friends are to blame for what I have become. All I can do now is sit and wait until zero day comes. I promise you, you WILL be sorry for what you did to me."

July 20, 2012: "I can't wait till my zero day. This shooting in Colorado has me excited."

July 21, 2012: "James [H]olmes had 6000 rounds of ammo, but only killed 12. He had full body armor but didn't shoot at the cops, and he rigged his apartment with explosives but told the police before they entered, so nobody got blown up. I could have done sooo much better."

July 21, 2012: "I'm going to show the world what a mass murder really is. 85 people dead. 160 injured. I'll get it done!"

(*Id*. at 29.)

In late July 2012, the Littleton police and the FBI became aware of the "KILLING SPREE" event and linked it to Jordan. Jordan admitted to having created the event but denied an intent to travel from her home in North Carolina to Colorado for it. In fact, she

---

[3] Zero Day is a 2003 film about a school shooting; it was inspired by the Columbine High School shooting.

had no means to get there because she was unemployed and had neither a driver's license nor a vehicle.[4]  Fortunately, the announced "KILLING SPREE" in Littleton on September 14, 2012, did not occur, but the local police were placed on heightened alert.

*B. Indictment and Change of Plea*

Jordan was indicted with two counts of transmission of a threat in interstate commerce in violation of 18 U.S.C. § 875(c).  She agreed to plead guilty to one count in exchange for the dismissal of the other and the government's promise to recommend a sentence of 3 years' probation.  But she had second-thoughts at the change of plea hearing, when the judge expressed "great concern" over a sentence of probation, saying:

> I didn't know anything about this case until I picked up the file this morning and  read the plea agreement in anticipation of this hearing.
>
> And I will keep an open mind.  That's my job.  That's my obligation.  And consider whatever you all have to say.
>
> But on the surface of this, I will tell you . . . there is no such thing in my view as joking about Columbine or about killing people or about following up on the legacy of Eric Harris or any such thing.  Those of us who lived through the Columbine shootings have very strong feelings about that subject matter, and we've seen copycat events time and again.  It seems that every time you pick up a paper these days, there's something that you read about.  Apparently just yesterday in Georgia, there was another one.
>
> And therefore, when I look at this plea agreement and I see that the Government, the United States attorney's office, is recommending probation, that gives me great concern.  When I see that the Government is suggesting a six-level adjustment to the offense level on grounds that this was a single incident

---

[4] The FBI contacted several individuals who had indicated on Facebook that they planned to attend the event.  When interviewed they all said they did not actually intend to do so.  But, as the district judge aptly noted, "[t]hat's what you would expect them to say to an FBI agent . . . ."  (R. Vol. II at 57-58.)

evidencing little or no deliberation, my first reaction, at least on the surface is, Are you kidding? Of course it involved deliberation. This wasn't accidental. And when I combine that with what I read in this plea agreement, not just the ["KILLING SPREE" event] but these [other postings] and I turn the page and see where the parties agree that these additional statements were not true threats, are you kidding me?

So that is my reaction. And I read that Ms. Jordan—and I hold no personal animosity towards her whatsoever—but I read where she's got a history of embezzlement, bogus checks, carrying a concealed weapon? And I put that together with the threats and conduct here and I think about, for example, how the Government comes in day after day and asks me to send people who are here illegally from Mexico to prison for months, if not years, and I see that they want probation for Miss Jordan, it makes me wonder what kind of a world we live in here.

Now, I'm telling you these thoughts because I want them to be very open, so that you can make whatever decisions you need to make; but I am not inclined, at least without being persuaded otherwise, to probation . . . .

(R. Vol. II at 5-7.)

The hearing was continued to allow Jordan the opportunity to consider her options. She eventually accepted the agreement and pled guilty. However, she recognized that the government's agreement to recommend probation was only that—a recommendation the judge was not required to accept. In short, she understood the judge was not obligated to follow the parties' recommendations and could impose any just sentence up to the statutory maximum (5 years). By its terms the plea agreement would become null and void if the judge rejected any part of it. Jordan never sought that direct and adequate remedy.

*C. Sentencing*

The presentence report (PSR) determined the base offense level to be 12. *See* USSG §2A6.1. To that, it added two levels because the offense involved more than two

threats (the other Facebook posts). *See* USSG §2A6.1(b)(2)(A). Applying a two-level downward adjustment for acceptance of responsibility, *see* USSG §3E1.1(a), the total offense level was 12.

Jordan was assigned two criminal history points for two prior felony convictions (embezzling over $2,000 from her employer and forging checks) and a misdemeanor conviction for carrying a concealed weapon. In each case, she received a suspended term of imprisonment; she was ordered to pay restitution on the embezzlement and forgery offenses. Another two criminal history points were added because she committed the instant offense while on probation for the embezzlement conviction. The resulting Criminal History Category was III, with an advisory guideline range of 15-21 months imprisonment. A sentence of probation was not permitted under the guidelines.

Nevertheless, the probation officer recommended a sentence of 5 years' probation with the following special conditions: Jordan be required to receive substance abuse and mental health treatment, take all prescribed medications, and submit herself, her property, and her personal belongings to search. Seemingly, the probation officer tried to balance his recommendation by accommodating competing values. He noted (1) the current offense was Jordan's third felony conviction, (2) she had served only limited jail time for her prior convictions, (3) she had failed to pay previously-ordered restitution, and (4) the instant offense was a serious one. On the other hand, (1) there was no evidence Jordan had the means to carry out the "KILLING SPREE" event, (2) she experienced a "horrific and chaotic childhood [with] physical, sexual, and mental abuse," (3) she had not received mental health treatment in the past, which led to her criminal history and the

- 7 -

commission of the instant offense, (4) she had made "exceptional progress" with her current mental health treatment, and (5) she had complied with the conditions of her bond for over a year. (Supp. R. at 84.)

Jordan agreed with the probation officer's recommendation but objected to the two-level enhancement for multiple threats under USSG §2A6.1(b)(2)(A). Relevant here, she claimed the other Facebook posts were not true threats because they did not target a specific victim. In the plea agreement, the government agreed these other posts were not true threats.

At sentencing, Dr. Thomas Martin, Jordan's treating psychologist, confirmed Jordan's improvement with treatment and medication. According to his testimony, imprisonment "will essentially stop that process" and Jordan would "give up." (R. Vol. II at 30.) Defense counsel vigorously argued for a probationary sentence with treatment and medication as "best for Miss Jordan, . . . best for society, and . . . best for this case." (R. Vol. II at 51.) The government also recommended probation because "the most effective way to protect the public from [Ms. Jordan] going forward is [for her] to continue [her] treatment . . . and medication under supervision."[5] (R. Vol. II at 57.)

The judge didn't quite see it that way. He outlined the statutory imprisonment range (not more than 5 years imprisonment) and the facts of the offense, including the other Facebook posts. After denying Jordan's objection to the multiple-threat

---

[5] Even the FBI agents involved in the case agreed the appropriate sentence was probation.

enhancement he turned to the parties' request for a variance from the guideline range (15 to 21 months, no probation). He considered a downward variance to be appropriate but declined the invitation of probation only. We recite his reasoning in full because it is pertinent to the recusal issue:

> In addition to the Guidelines, the Court considers other factors under 18 U.S.C. § 3553. The nature and circumstances of the offense. I've indicated that she apparently didn't have the ability to carry it out. In that sense, they were hollow threats. But threats like those, maybe especially here in Colorado, are extremely serious.
>
> I don't know where all of you folks were or what you were doing when Columbine occurred. But I know where I was. I was a judge in Jefferson County. My kids went to Columbine High School. Frank DeAngelis is a friend of mine.[6] We knew, my wife and I and my kids, knew people who were killed and people who were injured. And when somebody invokes the name of Eric Harris to make threats to go back to Littleton, Colorado, and start killing people, it's something that this judge at least takes very, very seriously.
>
> It so happens that I was the judge to whom all of the cases filed in Jefferson County arising out of the Columbine shooting were assigned. It so happens that this is also the judge to whom all of the civil cases arising out of the Aurora theater shootings were assigned. So I've had up-close and personal contact with these things.
>
> I'm very aware of copy cat events that have occurred. You might be surprised—maybe not—to know that there have been literally dozens of mass shootings in the United States in the last 20, 25 years. Actual mass killings. They've occurred in schools. They've occurred in shopping centers. They've occurred in military bases. They've occurred on a railroad train. They've occurred, as we know, in a theater.
>
> This is nothing to joke about. This is nothing to fool around about. Even casual remarks have to be taken seriously. On a much lesser scale perhaps, I think we all know that you go to the airport and you start going through airport security and popping off about this or that, you have a gun or there may be a bomb or

---

[6] DeAngelis was the principal of Columbine High School in 1999.

whatnot, and you're whisked off by the law enforcement pronto. We don't take these things casually anymore.

So when I think about the nature and circumstances of the offense, I cannot understate how seriously I take it.

We also consider the history and characteristics of the defendant. And on that score, I have very high sympathy and compassion for her. To begin with, because I personalized this a little bit by remarking about Columbine and Aurora, in Jefferson County, where I sat as a judge for 13 years, I chaired the criminal justice teaching planning committee, and as such, we created a subcommittee on mental health, and it was a very active and a very successful subcommittee and one I'm proud of because I think everybody who participates in the criminal justice system knows that a very high percentage of the people who are convicted of crimes and very significant percentage of people we have in our prison system have mental-health issues, serious mental-health issues. And I think those of us in the system that have dealt with it for years pretty much agree that our country doesn't do what it should do for those who are mentally ill. The prisons have become sort of a fallback and it's . . . just a very sad and serious problem.

Here we have a young woman who, perhaps like Klebold[7] and Harris, perhaps like others of these people that have become household names, were bullied in school. They were outcasts, they were isolated, they were thought of as being different. They were mistreated by their peers. It certainly didn't help that . . . Ms. Jordan had a mother who was physically abusive. It certainly didn't help that . . . she was also subjected to sexual abuse.

When someone has been brought into the world and then receives such a bad hand, so to speak, one can only be sad about it, angry about it, frustrated about it, and sympathetic to her. And therefore it doesn't surprise me, quite frankly, that she developed frustration and she developed anger and that she developed depression and posttraumatic stress disorder and anxiety disorder. She's a product of her environment and her environment was lousy.

Also, I want to commend her for responding very successfully to mental-health treatment. It seems to me – and of course I don't know Dr. Martin; all I know of him is what I read in the file and what I've seen here in this hearing—but it seems to me that he is an exceptionally good practitioner of psychiatry and

---

[7] Dylan Klebold was the other individual involved in the 1999 mass shooting at Columbine High School.

forensic psychiatry. It seems to me that he has been extraordinarily helpful to Ms. Jordan and that she has been quite responsive to his treatment. And that she has made incredible progress.

And when it is said by Dr. Martin and by a probation officer that I truly respect and by these lawyers whom I also respect, that any type of prison sentence will be a step backwards, maybe 100 steps backwards, I have to respect that. And I don't really have any ability to doubt that.

But I have to look at the whole picture. That's my job. I'm not here to be an advocate. And the whole picture has other parts to it.

As I have said during this hearing, Ms. Jordan does not come before this Court with a clean history. She has two prior felony convictions, one for embezzlement and one for forgery, both relatively recent. In 2009. But more worrisome than even those two felony convictions to me, she has a misdemeanor conviction for carrying a concealed weapon. The facts reported to me are, brief summary, that she lost her apartment after shooting a gun in it. She moved into a friend's residence. The friend later found a .45 caliber handgun and a journal containing a hit list of people she planned to kill, a suicide note, and statement about a planned shooting spree at her job. She also was found to have possessed two books on serial killers. This was, again, in 2009. It's worrisome.

This event in 2012 has certain *deja vu* all over again aspects to it.

I have also noted that each time she has been convicted in the past, she has received a suspended sentence. A five-year suspended sentence[] for her first felony. A one-year suspended for her second felony, and 30 days suspended for her misdemeanor. Each time she has been fined but has failed to pay her fines, causing warrants to be issued.[8] She has a warrant for failure to appear. She committed the present offense while she was on probation for her first felony.

So probation has been tried before. Suspended sentences have been tried before. And that is what presents to this Court in this case.

The Court must consider the . . . several factors: seriousness of the offense. I don't need to repeat myself.

---

[8] During the pendency of this case in the district court, Jordan made payments toward her fines. The judge later acknowledged her efforts.

Promotion of respect for the law. Now, it has been said today that she has developed over the course of her treatment respect for the law. And I appreciate that. And I accept that. But her history has not shown respect for the law.

Punishment. That's a factor here. It's a factor in every sentence. I've talked about the Guidelines, but I've also talked about the statutes, how seriously Congress takes this case.

Community safety. One of the things a judge has to do is do what he or she can to protect the community. The pattern of threats, the history of possession of a firearm are concerning to me. Dr. Martin's diagnoses and his optimistic report on her progress are very encouraging. By the same token, I note that in his October 1, 2013 report, Dr. Martin states, and I quote, She currently presents with no serious destructive ideation and has vocalized no . . . plans of harms against anyone.

And even in his August 14, 2014 update, just last month, he repeated the same statement but added, While in therapy, Miss Jordan remains a low risk to reoffend.

I note those comments because the flip side is if she is not in therapy, she may not be a low risk to reoffend.

But quite frankly, I am not so concerned about community safety with her as I am concerned about the other factor that I mentioned to counsel in my previous minute order, and that is deterrence. To me that is a huge factor in this case. This case has already received some degree of media attention. I don't know if it will receive any more or not. There isn't anybody from the media present today. But people who are tempted to make threats like this have to understand that there are consequences for this. And there are serious consequences for doing this. You can't just go around making threats to kill people, mass killing people, in Colorado, and not expect a consequence. And if it sets her back, I am sorry. But I have to do what I have to do.

Rehabilitation is another factor. And rehabilitation is quite important in this case because she needs and hopefully will receive mental-health treatment while under the supervision of the probation office, if not even while incarcerated.

Restitution to victims is also a factor. It hasn't been mentioned today. I wonder why. Because there are victims here. The Jefferson County law-enforcement people had to go into heightened security. They had to take this seriously. And to that extent, they are victims. I think we are all victims in a sense. We can't get restitution, but we're victims when these things happen.

I've considered very seriously the recommendations of all these people for probation. I am going to vary downward, and I have thought hard and long about what is fair. I have thought hard and long about what is just. What is needed to send a message. I suspect there are people out in our community who think nothing less than a maximum prison sentence would do it. I disagree completely with that. But I think there has to be some message and some incarceration as part of the overall package.

As I said, the Guideline range is . . . 15 to 21 months. Even that I think is too high. Even that I think takes her out of circulation too long.

(R. Vol. II at 67-74.)

Ultimately Jordan was sentenced to 6 months in prison and 3 years of supervised release.

*D. Motion for Recusal*

Later that day, Jordan filed a motion to reopen sentencing and delay entry of the judgment to allow her to file a motion for recusal under 28 U.S.C. § 455(a). The basis of her motion was the judge's personal connections to the Columbine High School shooting. According to her, those connections significantly affected the judge's sentencing decision as evidenced by a sentence at odds with the recommendations of others.

The judge construed Jordan's motion as a request for him to recuse, but concluded recusal was not warranted:

In the first place, just to be clear, I unequivocally state that I harbor no bias or prejudice against Ms. Jordan. I also think that the record of the sentencing hearing and previous hearings in the case will speak for themselves on that score.

Secondly, trial judges, like jurors, do not check their background or experience at the door to the courtroom. Judges are people, and we bring our own histories with us to the job. If something in our background creates an actual bias or even the appearance of impropriety, we must disqualify ourselves from the particular case. We need not, indeed may not, await a motion from a party to do

- 13 -

so. It requires an exercise of judgment, and the judgment must be exercised in a fair and reasonable manner. It hardly needs to be said that any judge, in Colorado or elsewhere, is repulsed by incidents such as the Columbine and Aurora Theater shootings. I happen to have had a more personal acquaintance with those two specific incidents than some others. But my judgment is that that history, though certainly part of whom I am, does not create an impermissible bias or appearance of impropriety.

(R. Vol. I at 114-15.)

## II. Discussion

Jordan tells us recusal is required under § 455(a). She also challenges the application of the two-level enhancement under USSG §2A6.1(b)(2)(A) for the offense involving more than two threats.

### A. Recusal

Any request to recuse must be carefully considered and a denial clearly explained. But a judge has a duty to sit when there is no basis to recuse. *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995). As always, that is our starting premise. A judge should recuse only for good and sufficient reasons, never to avoid a difficult task or indulge a party.

Section 455(a) requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Its purpose is "to promote public confidence in the integrity of the judicial process . . . ." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 858 n.7 (1988). It is designed to not only eliminate actual bias or prejudice but also the appearance of bias or prejudice. *See Liteky v. United States*, 510 U.S. 540, 548 (1994); *see also United States v. Greenspan*, 26 F.3d 1001, 1007 (10th Cir. 1994) ("There are few characteristics of a judiciary more cherished and

- 14 -

indispensable to justice than the characteristic of impartiality.  Congress has mandated that justice must not only be impartial, but also that it must reasonably be perceived to be impartial.").

The test is objective: "whether a reasonable person, *knowing all the relevant facts*, would harbor doubts about the judge's impartiality."  *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987) (emphasis added); s*ee also Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1310 (10th Cir. 2015) ("Section 455 contains an objective standard: disqualification is appropriate only where the reasonable person, were he to know all the circumstances, would harbor doubts about the judge's impartiality.") (quotation marks omitted); *United States v. Nickl*, 427 F.3d 1286, 1298 (10th Cir. 2005) (whether a judge should recuse himself under § 455(a) is a "purely objective" standard; "[a] judge's actual state of mind or prejudice is not at issue") (quotation marks omitted); *Nichols*, 71 F.3d at 351 ("[C]ases within § 455(a) are extremely fact driven and must be judged on their unique facts and circumstances more than by comparison to situations considered in prior jurisprudence.") (quotation marks omitted).  "Recusal is necessary when a judge's actions or comments reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."  *Nickl*, 427 F.3d at 1298 (quotation marks omitted).

Jordan does not contend the judge harbored any actual bias or prejudice.  Rather, she says his comments at sentencing regarding his personal connections to the Columbine High School mass shooting, combined with his sentencing decision, created an

appearance of bias. Our review is for an abuse of discretion.[9] *See David v. City & Cnty. of Denver*, 101 F.3d 1344, 1351 (10th Cir. 1996).

Not surprisingly, Jordan wants us to focus on the two factors most favorable to her. But the test is objective and global; we ask whether a reasonable person, <u>knowing all the facts</u>, would question the judge's impartiality. Considering <u>all</u> the facts, we easily conclude the judge's comments did not create an appearance of bias or prejudice.[10] And, as we later explain, the sentence imposed does not change the calculus.

Two of the judge's three children had attended Columbine High School, but before the shooting,[11] he and his wife knew people who were killed and injured in the shooting, and the high school principal was a friend. As state trial judge he was assigned the civil cases arising out of that shooting. Additionally, he openly acknowledged taking threats invoking the name of Eric Harris and proposing "to go back to Littleton, Colorado, and start killing people . . . very, very seriously." (R. Vol. II a 68.) But this is

---

[9] "Normally, a party alleging judicial bias should move for recusal . . . in a timely fashion." *Nickl*, 427 F.3d at 1297 (quotation marks omitted). If it fails to do so, we review for plain error. *Id.* at 1297-98. In this case, the judge did indicate at the aborted change of plea hearing that he "lived through" the Columbine shooting and had "very strong feelings" about it. (R. Vol. II at 6.) However, he did not elaborate until sentencing. Although Jordan did not seek recusal then, she did so later that same day. We need not decide, however, whether Jordan's recusal motion was timely. Even assuming so, we see no abuse of discretion.

[10] According to Jordan, if the recusal question is close, "the balance tips in favor of recusal." *Nichols*, 71 F.3d at 352. When properly considering <u>all</u> the facts, the issue is not close.

[11] In his order denying recusal, the judge clarified his statements at sentencing— two of his three children attended Columbine High School but not at the time of the shooting.

not the Columbine case and she is not being prosecuted for participating in that shooting. We are here considering only her threats to engage in another mass shooting in Littleton, Colorado, even more horrific than Columbine. It is aggravated (should threats of mass murder even be capable of aggravation) by urging others to participate. Jordan purposely evoked images of the Columbine shooting for dramatic effect—Littleton is home to Columbine High School and the threat was posted on a Facebook account she named after one of the Columbine shooters. She should not be surprised with the probable success of her strategy—the more closely intended victims of her threat were connected to the Columbine shooting the more likely and severely they would be impacted by the threat. But, that is not the issue here. Neither the judge nor his family were victims of that, or any other, shooting and threats of a mass killing (this case) are, alone, universally deplorable. And on that scale the judge's attenuated connections to the Columbine shooting are not sufficient to question his objectivity or the appearance thereof, particularly considering his open and detailed discussion and the balance he struck between the severity of the crime and the circumstances of the criminal (discussed *infra*).

Unsurprisingly, this judge found <u>all</u> mass shootings deplorable, not just Columbine. How could it be otherwise; when "[j]udges take an oath to uphold the law; they are expected to disfavor its violation." *United States v. Cooley*, 1 F.3d 985, 993 n.4 (10th Cir. 1993) ("[G]enerally stated views, even when expressed strongly, against a wide variety of conduct, such as murder, invidious discrimination, rape, drug trafficking, and mayhem, to illustrate the obvious, or in favor of the First Amendment, for example, are not unreasonable for a judge, and would not, absent more, disqualify a judge from

- 17 -

sitting on a case involving the same subject matter."). The sentiment is global. It is shared by Congress and society as a whole. Who, we might ask, takes mass violence (real or threatened) lightly? Surely no responsible person or collection of persons.

A fully informed and objective observer might infer bias from an inordinately harsh sentence. But this sentence was hardly that. Not only was it reasonable, it was entirely justified by the reasons given. We fail to see how the imposition of a modest term of imprisonment (substantially less than the guidelines recommend) reasonably informs the recusal debate in this case.

The sentence here is an adverse ruling which, while fodder for appeal, does not normally constitute a basis for recusal. *See Liteky*, 510 U.S. at 555 ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion."); *Green v. Branson,* 108 F.3d 1296, 1305 (10th Cir. 1997) ("[A]dverse rulings cannot in themselves form the appropriate grounds for disqualification.") (quotation marks omitted). This is so, perhaps particularly so, when the judge has faith in his experience and judgment and the courage to heed them. Judicial independence is generally considered a positive, not a liability. As we will explain, the judge provided good reasons why imprisonment was appropriate under the 18 U.S.C. § 3553(a) factors. Moreover, while all the parties recommended probation, the sentencing guidelines did not. They recommended 15-21 months imprisonment and probation was not an option. That the judge's sentencing decision finds support in the guidelines is further proof it was not the result of bias but instead reasoned judgment. *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (while the guidelines are advisory, they do "seek to supply some sense of what

- 18 -

other courts across the country are doing in similar cases and what sentencing experts think may be appropriate"); *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007) (a "concurrence between the Sentencing Commission's 'wholesale' judgment and the district court's independent 'retail' judgment . . . is strong evidence of the reasonableness of the ultimate sentence imposed").

While the judge has deep (and appropriate) personal convictions about random violence and threats of random killing, he also has a history of study of mental illness and a committed sensitivity to those suffering from it—while sitting as a state trial judge he helped create a committee addressing mental health issues. He was sympathetic to individuals, like Jordan, with mental illness. Indeed, he was keenly aware prison could halt Jordan's progress in treatment and cause her to regress. He also recognized that prison is often inappropriately used as a solution for those with mental illness. Interestingly, but not surprisingly, no one claims the judge should have recused because of his sympathetic personal beliefs and connections.

The judge performed a painstakingly thorough, almost wrenching, analysis of the § 3553(a) factors. That included examining Jordan's criminal history, which included two prior felony convictions and a misdemeanor concealed weapon conviction. Such conduct, according to the judge, showed disrespect for the law. And he was justifiably troubled by the misdemeanor conviction because it involved not only the possession of a gun but, ominously, a journal containing a list of people Jordan planned to kill, a suicide note, and a statement about a planned shooting spree at her place of employment. Also of concern was Jordan's successful avoidance of jail time on these previous convictions.

Obviously, her being placed on supervision in the past (Jordan's requested relief) had not served as a meaningful deterrent.

And particularly important was specific deterrence. Jordan's treating psychologist said she was a low risk to reoffend if she continued in therapy. The judge recognized the big **if** and aptly noted the converse—her failure to continue with treatment poses a high risk of recidivism, perhaps with lethal consequences. To that we would add her poor performance on past probations does not auger well for her perseverance in treatment.

Turning to general deterrence, the judge believed it was essential for the sentence to send a message to others contemplating similar conduct that serious consequences will result. Indeed, "[g]eneral deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized." *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) (unpublished). He reasonably believed imprisonment was necessary to send that message.

Finally, the judge considered the need for restitution. He correctly recognized that while Jordan inflicted no physical wounds, there were victims—the local police were on heightened alert on September 14, diverting them from other duties and society as a whole suffers from threatened acts of mass violence.[12] Those in Littleton and its environs

---

[12] Jordan says the judge further personalized the hearing by saying "I think we are all victims in a sense. We can't get restitution, but we're victims when these things happen." (R. Vol. II at 74.) We view this statement as merely the judge's acknowledgment that he too is a member of society.

likely suffered more acutely because of the recent, notorious mass shootings and killings there and nearby.

In sum, the totality of these circumstances reveals a judge who, while personally familiar with the Columbine shooting and its aftermath, studiously and publicly demonstrated an ability to separate those tangential matters from his judicial duties. Perhaps more telling is his enlightened and demonstrated sympathy for and commitment to those, like Jordan, with mental illness. That factor is more than sufficient to offset any supposed slivers of bias against Jordan. They also demonstrate the judge's firm commitment to meeting the challenge left to him alone—imposing a just sentence.

As the judge aptly stated: "[T]rial judges, like jurors, do not check their background or experience at the door to the courtroom." (R. Vol. I at 114.) Nor would parties like Jordan necessarily want them to do so as they can work in their favor. It is only when a judge's background and experiences make fair judgment impossible that recusal is necessary. This sentence was appropriate punishment for a serious offense.

We see no objective appearance of bias or prejudice in the sentence imposed, the judge's connections to the Columbine shooting, his remarks during the proceedings or all three taken together. Nor would others adequately aware of all relevant facts and circumstances.

*B. Sentencing Enhancement*

In the district court, Jordan objected to the two-level enhancement under USSG §2A6.1(b)(2)(A) for the offense involving more than two threats. She argued the other Facebook posts were not true threats because they were not directed at any specific

individual or group.  The government agreed.  The district judge did not: "What cannot be reasonably disputed is that these were threatening communications.  There's no question in my mind about that.  Particularly those of June 17, July 8, July 10, July 20, and the two July 21 communications . . . ."  (R. Vol. II at 66.)

Jordan expands her argument on appeal.  While she reiterates her specific victim argument, she also argues for the first time that the enhancement was inappropriate because she lacked the requisite subjective intent to threaten.

*i. Specific Individual or Group*

Because Jordan raised this argument in the district court, "we review the district court's factual findings for clear error and any legal determinations de novo."  *United States v. Barela*, 797 F.3d 1186, 1189 (10th Cir. 2015).

USSG §2A6.1(b)(2)(A) does not define "threat" and we have scant case law on the subject.  What we do know is that in counting the threats, we focus "on the number of threatening *communications*."  *United States v. Parker*, 551 F.3d 1167, 1173 (10th Cir. 2008).

Turning to other circuits, Jordan says the term "threat" in §2A6.1(b)(2)(A) means the same as it does in the statutes criminalizing threats.  *See United States v. Spring*, 305 F.3d 276, 280 (4th Cir. 2002); *see also United States v. Frazer*, 391 F.3d 866, 871 (7th Cir. 2004).  And, according to her, in order to avoid improperly restricting speech protected by the First Amendment, criminal punishment can only be imposed on individuals for communications constituting "true threats."  The Supreme Court has defined "true threats" as "those statements where the speaker means to communicate a

serious expression of an intent to commit an act of unlawful violence *to a particular individual or group of individuals*." *Virginia v. Black*, 538 U.S. 343, 359 (2003) (emphasis added).

We assume, without deciding, that to be a "threat" under §2A6.1(b)(2)(a), a communication must be directed to a particular individual or group of individuals. We nonetheless conclude this requirement is satisfied in this case.

The other Facebook posts did not explicitly mention to whom they were directed, instead referring to the generic "you." But, placed in context with the "KILLING SPREE" event posted on July 21, it is clear these other posts, in particular the post from July 20 and the two on July 21, refer to the community of Littleton, Colorado. As the probation officer correctly reasoned: "Taken into context with the threat [Jordan] made on July 21, 2012 [the "KILLING SPREE" event], it appears clear [she] made more than two threats although her objective was not clearly defined until July 21, 2012." (Supp. R. at 87.)

*ii. Subjective Intent*

In *United States v. Heineman*, we held a "defendant can be *constitutionally convicted* of making a true threat only if the defendant intended the recipient of the threat to feel threatened."[13] 767 F.3d 970, 978 (10th Cir. 2014) (emphasis added). According

---

[13] The Supreme Court recently addressed whether 18 U.S.C. § 875(c), which makes it a crime to transmit in interstate commerce "any communication containing any threat . . . to injure the person of another," requires a mens rea and, if not, whether the First Amendment requires such a showing. *Elonis v. United States,* –-- U.S. ---, 135 S.
(Continued . . .)

- 23 -

to Jordan, this same subjective intent requirement is necessary to establish her offense involved more than two threats under §2A6.1(b)(2)(A). Yet the judge made no findings concerning her subjective intent as to the other Facebook posts. Indeed, Jordan claims there is no evidence in the record showing she intended to instill fear in any individual or group with these posts; rather, she emphatically denied having any such intent. But her subjective denials are dramatically at odds with objective facts. It was hardly by accident that she chose the Denver area and particularly Littleton as the killing ground. She quite obviously intended to play on the sensibilities of that population.

Jordan concedes she did not raise this argument with the district court. Nevertheless, she claims she is entitled to relief under plain error review. Yet she also acknowledges that "factual disputes regarding sentencing not brought to the attention of the district court do not rise to the level of plain error." *United States v. Lewis*, 594 F.3d 1270, 1288 (10th Cir. 2010) (quotation marks omitted). To avoid this result, she argues her claim is not a dispute over unchallenged factual findings: "To be clear, it is not [her] contention that the facts recounted in the PSR and adopted by the court are wrong, but that the district court made no findings with respect to whether Ms. Jordan intended anyone to feel threatened by the additional posts . . . . And, following *Heineman*, we now know that this was error because subjective intent is required to satisfy the First

---

Ct. 2001, 2004 (2015). The Court held that the statute, although silent regarding any intent, nevertheless requires that "the defendant transmit[] a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Id.* at 2012. The Court did not reach the First Amendment issue.

Amendment and, thus, to apply §2A6.1(b)(2)(A)." (Appellant's Reply Br. at 22-23.) In other words, she claims her argument is a "*legal* question of what §2A6.1(b)(2)(A) requires." (*Id.* at 24.) Even construing her argument as such, she has failed to show plain error.

To satisfy plain error, Jordan must show (1) the judge committed error; (2) the error was plain; (3) the error affected her substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Gantt*, 679 F.3d 1240, 1246 (10th Cir. 2012). To be plain, "[an] error must be clear or obvious under current, well-settled law." *United States v. Story*, 635 F.3d 1241, 1248 (10th Cir. 2011) (quotation marks omitted). "In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." *Id.* (quotation marks omitted).

The Supreme Court has not held that the First Amendment requires subjective intent to threaten in order for an individual's communication to constitute a threat under §2A6.1(b)(2)(A). Nor have we. *Heineman* established only that the First Amendment requires such intent in order for an individual to be <u>convicted</u> under the criminal threat statutes. Indeed, "[w]e have repeatedly held that when the plain language of a guideline, in contrast to a criminal statute, does not include a *mens rea* element, we should not interpret the guideline as containing such an element." *United States v. Ray*, 704 F.3d 1307, 1312 (10th Cir. 2013) (collecting cases). USSG §2A6.1(b)(2)(A) contains no mens rea requirement. Thus, the judge's failure to make factual findings concerning Jordan's subjective intent concerning the other Facebook posts prior to imposing the two-level

enhancement did not amount to plain error.

       **AFFIRMED**.

                             **Entered by the Court:**

                             **Terrence L. O'Brien**
                             United States Circuit Judge